Timothy Glen EDWARDS, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CO–1079.

District of Columbia Court of Appeals.

Argued Feb. 15, 2000.
Decided Feb. 15, 2001.

vor. We affirm the order setting aside the default.

Christopher Griffiths, with whom Douglas J. Wood, was on the brief, Riverdale, MD, for appellant.

Marianela Peralta, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, John R. Fisher, Thomas J. Tourish, Jr., and Julie A. Grohovsky, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and WASHINGTON, Associate Judges, and PRYOR, Senior Judge.

PER CURIAM:

Timothy G. Edwards appeals from an order denying without a hearing Edwards' motion to vacate his guilty plea. Edwards asks that we set aside his convictions, contending that at the time of his plea he suffered from a mental defect resulting from brain damage, that he did not understand the nature and consequences of his plea due to a brain injury, and that the plea proceeding was fundamentally flawed because he did not have the benefit of

effective counsel, and the trial court failed to determine whether there was a factual basis for the plea. The government contends that Edwards' plea was knowing and voluntary and asks that we affirm the denial of Edwards' motion. We affirm.

## I.

### THE TRIAL COURT PROCEEDINGS

#### A. *Procedural background.*

On January 2, 1996, a grand jury returned an eleven-count indictment charging Edwards and his co-defendant, Gregory S. James, with two counts of kidnaping while armed, two counts of armed first degree sexual abuse, three counts of first degree sexual abuse, two counts of threats, one count of possession of a firearm during a crime of violence ("PFCV"), and one count of carrying a pistol without a license. On April 1, 1996, following an extensive colloquy pursuant to Super. Ct.Crim. R. 11, Edwards entered a plea of guilty to PFCV and to one count of first degree sexual abuse. The remaining charges against Edwards were dismissed as part of a negotiated plea agreement.[1]

On October 9, 1996, Edwards was sentenced to serve an aggregate prison term of fifteen to forty-five years. On November 12, 1997, more than one year after the sentence was imposed, Edwards filed a motion to vacate his plea. On June 18, 1998, the trial judge issued a written order in which he denied Edwards' motion without a hearing. This appeal followed.

#### B. *The government's proffer.*

During the Rule 11 colloquy, the prosecutor proffered that in the early morning hours of October 3, 1995, the complaining witness, a prostitute whose initials are K.W.,[2] was plying her trade in the area of

---

1. The government's plea offer to Edwards was "wired" to its offer to James. This means that the offer to each defendant was conditioned on the acceptance by both defendants of the government's proffered disposition. In this case, both defendants accepted the government's offer, and they entered their pleas during the same proceeding.

2. In light of the nature of the case, we think it best not to identify the complainant by name.

13th and L Streets, N.W. when she was approached by appellant Edwards, who was driving a black Ford Mustang. According to the prosecutor, Edwards offered to pay $50 to K.W. in exchange for a sexual act. K.W. entered the car, and Edwards drove her to an alley in the rear of a nearby department store. Edwards then "pulled a silver handgun, put it in the victim's face and clicked it, and ask[ed] for her money." K.W. handed Edwards $450 in cash.

The prosecutor further represented that Edwards then "popped" the trunk release of the Mustang, and that Edwards' co-defendant, Gregory S. James, emerged from the trunk. Edwards and James ordered K.W. into the back seat of the vehicle, covered her with a blanket, and drove to an alley on Capitol Hill. Upon reaching their destination, the two men forced K.W., against her will, to have oral and vaginal sex with each of them. Edwards and James also stole K.W.'s watch, rings, purse and coat. The men then told K.W. to hide in some nearby bushes,[3] and they drove off.

Following the robbery and rape, K.W. returned to the area of 13th and L Streets, N.W. She then proceeded to a hospital located in Alexandria, Virginia where she reported that she had been raped and requested medical attention. K.W. did not contact the police until the following night, under the somewhat fortuitous circumstances set forth below.

The prosecutor proffered that in the early morning hours of October 4, 1995, some twenty-four hours after her initial encounter with Edwards and James, K.W. was in the area of 13th and L Streets, N.W. when she again saw Edwards driving the black Mustang. At that point, K.W. reported the sighting to the police, and the officers soon located the vehicle in a nearby alley. Edwards was in the driver's seat and a woman known to the police as a prostitute was in the passenger seat. The officers opened the trunk of the Mustang and discovered Mr. James lying in it. The police recovered from the trunk a silver handgun which, according to K.W., resembled the weapon brandished by Edwards on the previous night. K.W. identified Edwards and James as the men who had raped and robbed her. According to K.W., Edwards was the driver of the car and James was the individual who had been hiding in the trunk.

## C. *The Rule 11 colloquy.*

The trial judge accepted the pleas of Edwards and James following a lengthy hearing.[4] During the colloquy, Edwards stated, *inter alia,* that he understood the charges to which he was pleading guilty, as well as to the maximum and mandatory minimum penalties for these offenses; that he was pleading guilty to these offenses of his own free will; that he understood that he was giving up his right to a trial, as well as the rights that he would have at a trial and the right to appeal a finding of guilt; that he was satisfied with his attorney; and that there were no questions that he wished to ask the judge. The prosecutor then described the government's evidence as set forth in Part I B, *supra,* but the proceedings ran into some difficulty when the judge asked Edwards whether he agreed with the prosecutor's proffer:

THE COURT: Okay. Mr. Edwards, is that what happened?

DEFENDANT EDWARDS: I didn't have no handgun in the car, your Honor. I didn't, I didn't hold no handgun to her head. It wasn't even like that.

THE COURT: Did you force her to have sex with you?

DEFENDANT EDWARDS: No, I paid her.

---

**3.** James made this order even more emphatic by showing K.W. a second handgun and remarking: "See this, get back in the bushes."

**4.** The transcript of the plea proceedings is twenty-eight pages long.

THE COURT: Well, Mr. Edwards, as I've indicated—

DEFENDANT EDWARDS: Excuse me. I mean no, don't get me wrong, she had sex with me.

The judge then attempted to explain to Mr. Edwards that he could not plead guilty to first degree sexual abuse if he was innocent:

THE COURT: I indicated to you, Mr. Edwards—let me clear something up with you before you plead guilty. Now I don't care whether you plead guilty or not, it's up to you. But, but in order to plead guilty, a person has to have forced a person to have sex with him or to have threatened her.

You would not be guilty if you paid her for sex. You would not be guilty of first degree sexual abuse, and I couldn't find you guilty. That would be punishing an innocent person. I couldn't let you plead guilty to a crime that you didn't commit.

There's no way anybody in this room can know whether you committed the crime except—and if you don't plead guilty, the jury will have to decide whether you did or not. But the only way I could find you guilty is if you stated that you were guilty. I don't know what happened.

THE COURT: As I've explained to you at the beginning of this what it means to be guilty, and I asked you whether you were prepared to admit that you were guilty and you told me yes.

Now are you able to admit that this act occurred as [the prosecutor] described? In other words, did it happen that way?

DEFENDANT EDWARDS: Yes, Your Honor.

THE COURT: They did?

DEFENDANT EDWARDS: Yes.

In spite of Edwards' one-word affirmative answer to the question whether "this act" occurred as the prosecutor had stated, it immediately became apparent that Edwards did not really agree with the prosecutor's account:

THE COURT: Did you possess a weapon?

DEFENDANT EDWARDS: No, I didn't hold a weapon.

THE COURT: Did you have a weapon where, where she could see it, where she was aware of it?

DEFENDANT EDWARDS: Yes.

The prosecutor had proffered, as we have seen, that Edwards put a handgun in K.W.'s face, clicked it, and demanded money, not that there was a weapon somewhere within K.W.'s view.[5]

While Edwards was not asked whether, by agreeing that the prosecutor's version was accurate, he was retracting his previous exculpatory account, the judge did give Edwards a final opportunity to withdraw his guilty plea and warned him that, if he wished to go forward with the plea, he would not be permitted to "tak[e] it back later." Edwards responded "yes sir." The judge then accepted Edwards' plea and found Edwards guilty of first degree sexual abuse and PFCV.

D. *Edwards' motion to withdraw the plea.*

On November 12, 1997, a new attorney, retained for Mr. Edwards by his parents, filed a motion on Edward's behalf to withdraw his client's guilty plea. The motion was based in substantial part on an evaluation of Edwards by Bronson Levin, Ph. D., a clinical psychologist. In his evaluation report, Dr. Levin related that he was told by Edwards that in November 1994, Edwards suffered substantial brain damage as a result of an alleged beating by the police which followed a high-speed car chase.[6] Edwards' injuries resulted in

---

**5.** We note, however, that Edwards did not plead guilty to robbery.

**6.** Dr. Levin related Edwards' description of this event and commented on its consequences:

"marked changes in both his cognitive and emotional functioning" and significantly affected his concentration and memory. According to Dr. Levin, Edwards had "trouble remembering names, including very familiar names like that of his dog." Dr. Levin administered a number of tests which revealed that Edwards' IQ was 76 (in the bottom 5% of the population),[7] and that

> [h]is scores in two areas were in the bottom 2% and similar to a retarded level. Verbal expression showed impairment in blocked ability to express ideas that he apparently knew ("I know it, but I can't put it out."). Spelling ability is only equal to a third grade student. On a test that is sensitive to the effects of brain-injury (Trial–Making), he showed both mild disruption of ability to follow a pattern and moderate impairment in ability to shift sequences, showing difficulty concentrating in circumstances that involve following more than one idea at a time.... These results are specific to brain impairment and are not due to depression from being incarcerated.

> [Edwards] was driving his girlfriend's car when he was approached by plainclothed police who he says did not identify themselves. He became frightened that he was about to become a carjacking victim so he sped off, losing control of the car at the first turn. By his report, the police then "beat me into the woods. They hit me with so many flashlights. They split my head open. Kicked me everywhere. I thought I was gonna die." He believes he lost consciousness briefly and was taken on a stretcher, in handcuffs, to the hospital where he remembers being in pain throughout his body. Hospital records indicate that the nose and eye socket bones were fractured, his vision was impaired, and there was a scalp hematoma. Surgery was performed to re-set an eye properly into its socket. He has had trouble with his vision ever since.

7. Because some of Edwards' scores were "close to average" and because Edwards read at the sixth grade level, Dr. Levin believed that Edwards' IQ was probably in the low 80s prior to the injury.

8. Edwards told the author of the PSI report:

Dr. Levin further reported that Edwards had continued to deny some aspects of the offense to which he had entered a plea of guilty, and that he had reiterated his claim of innocence not only at the plea hearing, but also at sentencing and in his statement to the writer of the pre-sentence report (PSI).[8] According to Dr. Levin, Edwards was "still in the post-concussive phase of his injury when he was involved in deciding whether or not to plead guilty to these charges." Edwards reported to Dr. Levin that, since the injury, "he loses track of the meaning of conversations if they become complicated. ('It don't comprehend to me like before')." Edwards further told the psychologist that at the court hearings, he was unable to sustain his attention to the process because "[a]t first, it sounded good.... Then I just gave up and thought hopefully somebody will explain this to me later on." Finally, after noting that Edwards' attorney at the plea, Thomas Dyson, Esquire, had apparently been less than helpful in explaining relevant procedures and issues to his client,[9] Dr. Levin concluded as follows:

> I didn't click a gun at her head. We paid her. She got upset and wanted more money.... We didn't take the money or property from her. The gun was in the trunk the night of the offense the whole time.

9. In support of the motion to vacate the plea, Edwards' attorney filed an affidavit by Gladys Mae Edwards, the defendant's mother, which was sharply critical of Mr. Dyson, the attorney she and her husband had initially retained to represent Edwards. According to Mrs. Edwards, Mr. Dyson did not return calls promptly and did little or nothing to explain his client's options to Edwards or to his parents. In fact, as far as she knew, Dyson never discussed a plea bargain with Edwards until the day of trial. Edwards' parents were opposed to their son entering a plea, for Edwards had always maintained his innocence. Mrs. Edwards had asked Mr. Dyson to advise her son that, in his parents' view, Edwards should not accept the plea bargain. She did not believe, however, that Dyson had conveyed this message to his client. According to Mrs. Edwards, Mr. Dyson had told Edwards and his parents "that the most that our son would do in jail would be five years."

Despite the [c]ourt's attempt to ascertain that he understood the process through its colloquy, Mr. Edwards was not comprehending the consequences of his plea. This incompetence was due to a post-concussive impairment in cognitive processing combined with inadequate and impatient handling by counsel.

Finally, it should be noted that Mr. Edwards' disability, while significant, does not prevent him from entering a new plea if the present one is withdrawn, provided, of course, that present counsel is cognizant of the dysfunction and communicates accordingly.

Relying heavily on Dr. Levin's evaluation, Edwards' new attorney argued in his motion that his client should be permitted to withdraw his plea. Emphasizing that Edwards was continuing to protest his innocence, counsel asserted that "Mr. Edwards pled guilty despite his claimed innocence [because] in spite of the [c]ourt's careful attempt to ascertain that Mr. Edwards understood what was happening, he did not understand that by pleading guilty he would forfeit his right to assert his innocence." According to the motion, Edwards "did not understand this basic concept because of his brain-injury induced limitations combined with his [previous] attorney's failure to take the time to explain matters carefully to Mr. Edwards." Finally, Edwards' new attorney claimed that his client's plea was "motivated by advice received from counsel which fell short of the range of competence demanded of attorneys in criminal cases," *McClurkin v. United States*, 472 A.2d 1348, 1360 (D.C.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984), and that the plea should therefore be vacated for that reason as well.

### E. *The trial judge's decision.*

On June 18, 1998, the trial judge denied Edwards' motion in a written order. The judge relied on Edwards' admission "in open court and on the record that (1) despite knowing that he was giving up certain legal rights and knowing the penalties he faced, he still wished to plead guilty; (2) he understood what he was doing; and (3) he did not wish to ask any questions." The judge emphasized that Edwards did not hesitate to dispute portions of the government's proffer when he disagreed with the prosecutor's account. The judge also pointed out that at the conclusion of the Rule 11 colloquy, he had "underscored the finality of the guilty plea, informing [Edwards] that he could still withdraw his plea, at that time." Edwards had indicated at that point that he "wished to go forward and would not try to take it back later." The judge stated that the defendant's representation in open court that he understood the plea proceeding and that he wished to plead guilty "carried a strong presumption of verity." In the judge's view, Edwards had been unable to overcome that presumption.

Turning to Dr. Levin's evaluation of Edwards, the judge was of the opinion that the psychologist's report did "not undermine the strong presumption arising from the plea hearing itself that [Edwards] understood the nature of the charges and the consequences of his plea." The judge characterized the report as "far too gener-

We note, however, that during the plea colloquy the judge correctly advised Edwards that the maximum sentence could be fifteen years to life. Mrs. Edwards and her husband had advised Mr. Dyson that, since their son's head injury, "he has had a difficult time with his memory and with his understanding of even the most basic concept." Mrs. Edwards did not "believe, from everything that I know, that my son understood what was occurring when he pled guilty."

At the time Edwards entered his plea, Mr. Dyson was facing the prospect of criminal charges for stealing from the estate of a client. Mr. Dyson later consented to disbarment, *In re Dyson*, 695 A.2d 112 (D.C.1997) (per curiam), and entered a plea of guilty to criminal fraud. *See* WASHINGTON POST, Sept. 29, 1999, at page B-4.

al," and he believed that Dr. Levin had failed to take into account the Rule 11 colloquy. Finally, the judge rejected the contention that Edwards should be permitted to withdraw his plea on the grounds that his original attorney was constitutionally ineffective:

> Defendant ... argues that his counsel was ineffective in giving advice to plead guilty, arguing that [counsel] did not take enough time to assure that the plea was knowing and intelligent. But, if the defendant did understand the consequences of his plea, as the [c]ourt has determined he did, then there was no prejudice to the defendant even if a thirty-minute discussion could be considered outside the wide range of competence accorded competent counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defendant conflates ineffectiveness and knowing and intelligent waiver. But there is no constitutional ineffective assistance of counsel if defendant did, as the [c]ourt found at the plea and reaffirms now, knowingly and intelligently waive his trial rights.

## II.

### LEGAL ANALYSIS

■ Edwards filed his motion to withdraw his guilty plea more than a year after the sentence was imposed. Under the applicable rule, "the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea," but this relief is authorized only when it is required in order to "correct manifest injustice." Super. Ct.Crim. R. 32(e). Edwards' motion is thus tested "under a high standard." *Southall v. United States,* 716 A.2d 183, 188 (D.C.1998). In order to withdraw a plea, the movant must not only demonstrate that the plea was manifestly unjust, but must also show that "the plea proceeding was fundamentally flawed such that there was a complete miscarriage of justice." *Williams v. Unit-*

*ed States,* 656 A.2d 288, 293 (D.C.1995) (citations omitted).

■ "It is fundamental to due process that a defendant who waives constitutional rights in entering a plea of guilty must do so voluntarily, knowingly, and intelligently." *Pierce v. United States,* 705 A.2d 1086, 1089 (D.C.1997) (quoting *Eldridge v. United States,* 618 A.2d 690, 695 (D.C. 1992)). In reviewing whether a guilty plea is voluntary, this court examines the entire plea record and analyzes the totality of the circumstances surrounding the plea. *See Henderson v. Morgan,* 426 U.S. 637, 644, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976). "Surrounding circumstances relevant to a reviewing court's inquiry concerning voluntariness include the complexity of the charges, the personal characteristics of the defendant, the defendant's familiarity with the criminal justice system and the factual basis proffered to support the court's acceptance of the plea," *McClurkin v. United States,* 472 A.2d 1348, 1355 (D.C.1984) (citations omitted).

In this case, Edwards offers two interrelated grounds in support of his argument that the trial court erred in denying his motion. He argues that his plea was not knowingly entered and thus was involuntary because (1) at the time of the plea he was suffering from a brain injury that made it difficult for him to follow the plea proceedings and/or understand and appreciate the consequences of pleading guilty; and (2) the plea proceeding was fundamentally flawed because the trial court was unaware of his diminished mental capacity and thus failed to adequately ascertain whether there was a factual basis for the plea. *See McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Interwoven into these arguments is Edwards' suggestion that his trial counsel was constitutionally ineffective because he failed to spend enough time helping Edwards understand either the factual basis for the plea or the consequences of the plea.

■ For essentially the reasons relied upon by the trial judge, we find Edwards' arguments unpersuasive. The trial judge's denial of the motion was informed by Dr. Levin's evaluation although it was based primarily on his own personal observations of and conversations with Edwards, factors to which we accord great deference.

■ At the outset it is important to note that while Dr. Levin reported in his evaluation that Edwards had sustained brain damage that left him functioning at a level of borderline mental retardation, Dr. Levin never opined that Edwards was incompetent to enter a plea. In fact, Dr. Levin concluded his evaluation by indicating that with proper and patient assistance, there would be no barrier to Edwards entering another plea if the trial court granted his motion to withdraw this one. Edwards argues that the trial judge erred in failing to hold a hearing to determine whether he was competent to enter a plea once the issue was raised to the court's attention on the record. While we agree with the proposition that "where the issue of a defendant's mental competence [has] been raised on the record, the trial court must conduct a specialized hearing to determine the competence of a defendant who seeks to plead guilty." *See Hunter v. United States,* 548 A.2d 806 (D.C.1988). We find that Dr. Levin's ultimate conclusion, that Edwards was competent to enter a plea if the nature and consequences of the plea were explained in an appropriate way, differentiates this case from *Hunter.*[10]

■ As the trial judge noted in his order denying Edwards' motion, Dr. Levin's evaluation, while indicating generally the types of problems Edwards' injuries caused him, did not focus on the Rule 11 colloquy that the trial court had with Ed-

wards. Our review of that colloquy reveals that once Edwards questioned the accuracy of the government's factual proffer, the trial court engaged in a careful, probing, patient, and extensive colloquy with Edwards in an effort to determine (1) whether there was a factual basis for accepting the plea; and (2) whether Edwards understood the consequences of pleading guilty. The trial court did not rush in its inquiry about the factual basis for the plea and the court took great pains to ensure that Edwards clearly understood what rights he was giving up by entering a plea.

Given Dr. Levin's evaluation, which was based in large part on Edwards' recollection of his state of mind during the plea hearing that took place over one year earlier, it would have been more consistent with his purported brain injury if when asked by the court whether he agreed with the government's proffer, Edwards had indicated, either directly or indirectly, that he did not understand or that he was confused by the factual proffer because it was too complicated for him to follow. Instead, Edwards, after listening to the extensive factual proffer made by the government, questioned only that portion of the factual proffer that alleged that he had personally held and used a weapon to rob and sexually assault K.W. We believe, as did the trial judge, that Edwards, in disputing a specific portion of the factual proffer, actually demonstrated that he was actively and mentally engaged in the plea process and understood the nature of the charges he was facing.

In questioning the accuracy of the facts contained in the government's proffer, Edwards essentially took exception to the government's allegation that he used force

---

10. Hunter is also distinguishable because that case involved a motion to withdraw a presentence plea which is reviewed for abuse of discretion under the more liberal "fair and just standard" as opposed to the higher "manifest injustice standard" we apply here. In addition, in Hunter we held that the trial court's denial of a motion to withdraw a guilty plea was error because the trial court improperly ignored evidence bearing on the appellant's competence to enter a plea. In this case, the trial judge clearly considered Dr. Levin's report but rejected it because the court found it to be unpersuasive on the issue of Edwards' competence at the time of the plea.

to either rape or rob K.W. stating that he had paid the victim for sex, that he did not have a handgun in the car with him on the night of the offense, and that he never held a gun to the head of the victim. At that point, the trial judge patiently and carefully explained to Edwards the nature of the charges to which he was pleading guilty, focusing in particular on the fact that the use of force was necessary in order for Edwards to be convicted of the crimes he faced. In addition, the trial judge made it clear that he could not and would not accept Edwards' guilty plea to the proffered charges of PFCV or sexual assault if K.W.'s conduct that evening was voluntary. A fair reading of Dr. Levin's evaluation suggests that even Edwards, with his mental deficiencies, was capable of focusing on and understanding the trial judge's explanation that force was a necessary element of the crimes to which Edwards was pleading guilty.

Nonetheless, before proceeding further with the Rule 11 colloquy the trial judge suggested that Edwards speak with his trial counsel so that he could address with him any further concerns Edwards had about the plea. After a very brief discussion at counsel table, Edwards, himself, indicated that he was ready to proceed with the plea. The court again questioned Edwards about whether he agreed with the government's proffer regarding the facts of the case. While he at first agreed that the government's previous proffer was accurate, upon further questioning by the trial judge about his involvement with a weapon, he disputed only the fact that he had held a gun to the victim's head. Importantly, he no longer contended that force was not used nor did he continue to contend that K.W. acted voluntarily. The

trial court, understanding Edwards' concern with the proffer to be the allegation that he had held the gun to K.W.'s head, inquired further so that he could determine whether there was any factual basis for Edwards' plea to PFCV. It was at this time that Edwards acknowledged that there was a gun in the front seat of the car where K.W. could see it during the incident. At that point, the trial judge was satisfied that there was a factual basis for the plea. Edwards does not claim, nor could he, that the factual proffer, as modified by Edwards, was insufficient to support his plea of guilty to PFCV and sexual assault.[11] Therefore, Edwards' claim that the plea proceeding was flawed because the trial court failed to properly determine whether there was a factual basis for the plea, is not supported by the record.

We also failed to find support in the record for the assertion by Edwards that because of his brain injury, he was unable to appreciate the consequences of entering pleas of guilty to these two charges. On no less that twenty-three occasions during his colloquy with the court, Edwards was asked whether he understood what he was doing and what rights he was giving up. On each occasion, Edwards answered affirmatively. While Edwards may have questioned the accuracy of the factual proffer made by the government, he at no time claimed to be confused by the trial judge's explanation of what rights he was giving up by entering a plea of guilty. Given Edwards' prior involvement in the criminal justice system, as well as the relatively lenient treatment he received for his prior convictions, it was not unreasonable for the trial judge to view his claim that he was confused about the consequences of his

---

11. Edwards pleaded guilty to unarmed first degree sexual abuse so it was not necessary for him to admit to holding a gun to the head of the victim in order for the plea to be factually supported. With respect to the PFCV charge, because it is a possessory offense, the government was only required to proffer facts from which a reasonable fact finder could conclude beyond a reasonable

doubt that Edwards constructively possessed a firearm on the night of the offense. Edwards' admission that he knew there was a firearm in the car, in plain view, and within his reach, was sufficient evidence from which a reasonable fact finder could find beyond a reasonable doubt that Edwards constructively possessed a weapon during the rape and robbery of K.W.

plea as insufficient to rebut the strong presumption of verity given to the statements he made to the court during the plea proceeding. *See Williams*, 656 A.2d at 294 (internal citations omitted).

Finally, the trial court accurately informed Edwards of the potential sentence he faced and ultimately gave Edwards an opportunity to withdraw his plea at the close of the proceedings. The trial judge was convinced that at the time of the plea, Edwards was competent to enter the plea based on the judge's personal conversations with him, as well as his observations of Edwards, and we see nothing in this record that would lead us to a different conclusion.

 Because we find that the trial judge did not err in denying Edwards' motion to withdraw his guilty plea, we also conclude that the trial court did not err in denying, without a hearing, Edwards' claim of ineffective assistance of counsel. Such a hearing was not required here where, as a matter of law, Edwards could not meet the prejudice prong of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), even if a thirty minute discussion on the day of trial to discuss the disposition of the case through a plea is considered outside the wide range of competence accorded competent defense counsel. As the trial judge correctly observed, "[t]here is no constitutional ineffective assistance of counsel if a defendant knowingly and intelligently waives his trial rights."

In this case, the trial judge, although admittedly unaware of Edwards' mental condition at the time of the plea, nonetheless engaged Edwards in a colloquy that was appropriately careful, considered, and thorough. To prevail here, Edwards must show that it would be manifestly unjust for the plea to stand and that the plea proceeding was fundamentally flawed such that it resulted in a complete miscarriage of justice. While we might say in hindsight that the trial judge could have asked even more probing questions during his Rule 11 inquiry, applying a reasonably objective litmus test to the colloquy here, we find that Edwards has failed to show that the plea proceeding was fundamentally flawed or that holding Edwards to his plea would be manifestly unjust. Given our deference to the trial judge's personal recollection of the proceedings and, after a thorough review of the record, we are convinced that the trial judge did not abuse its discretion in denying Edwards' motion.

*Affirmed.*

SCHWELB, *Associate Judge,* dissenting:

Although the issue is not an easy one, I am unable to agree with my colleagues' conclusion that Edwards was not entitled to a hearing on his motion to withdraw his plea. Accordingly, I respectfully dissent.

Edwards has based his motion, in part, on his allegation that his plea attorney was constitutionally ineffective. The nature of a motion is determined by its content, not its caption. *Cf. Wallace v. Warehouse Employees Union No. 730*, 482 A.2d 801, 804 (D.C.1984). Edwards' motion is therefore cognizable under D.C.Code § 23–110 (1996), as well as under Rule 32(e), and an evidentiary hearing was thus required "unless the files and records show conclusively that the movant can establish no facts warranting relief." *Southall v. United States*, 716 A.2d 183, 188 (D.C.1998) (citing, *inter alia*, D.C.Code § 23–110(c)).

As my colleagues recognize, "[i]t is fundamental to due process that a defendant who waives constitutional rights in entering a plea of guilty must do so voluntarily, knowingly, and intelligently." Maj. op. at 987 (quoting *Pierce v. United States*, 705 A.2d 1086, 1089 (D.C.1997)) (quoting *Eldridge v. United States*, 618 A.2d 690, 695 (D.C.1992)). If issues of competency have been raised on the record, "the trial court must conduct a specialized hearing to determine the competence of a defendant who seeks to plead guilty...." *Hunter v.*

*United States,* 548 A.2d 806, 810 (D.C. 1988) (quoting *Willis v. United States,* 468 A.2d 1320, 1323 (D.C.1983)); *accord, Pierce, supra,* 705 A.2d at 1089. Moreover,

> where it is alleged that an individual is mentally retarded, the trial court must consider that factor when determining whether an individual "has the mental capacity to achieve the necessary understanding" of a guilty plea. *See Hunter, supra,* 548 A.2d at 810 (citing *Masthers, supra,*[1] where the defendant was mentally retarded). Additionally, we have stressed that this is an area where expert testimony should be considered and a trial judge should refrain from relying on personal observations of the individual. *Hunter, supra,* 548 A.2d at 810–11 (expert informed judge that appellant appeared to be suffering from organic brain damage); *cf. Mitchell v. United States,* 609 A.2d 1099, 1104 (D.C.1992) (advising trial judge to have assistance of expert guidance and not rely on one's own perceptions where appellant is allegedly mentally ill, citing *Hunter* and *Masthers* ).

*Pierce, supra,* 705 A.2d at 1091–92.

In the present case, Dr. Levin reported in his evaluation that Edwards had sustained substantial brain damage which left him functioning at a level of borderline mental retardation. Edwards had an IQ of only 76,[2] and, according to Dr. Levin, this condition impaired his ability to "follow more than one idea at a time." In fact, Edwards' intelligence placed him in the bottom 5% of the population, and in two categories where he scored among the lowest 2%, Edwards functioned at the retarded level. Indeed, Edwards could not even remember simple familiar facts, such as the name of his dog. In other words, if Dr. Levin's assessment is credited, then for all practical purposes Edwards' mental capacity was comparable to that of a child.[3] Dr. Levin further reported that Edwards' plea attorney "impatiently instructed Mr. Edwards to leave the thinking to him."

During much of the plea colloquy, Edwards disputed the truth of some of the government's principal allegations. He denied that he had threatened the complainant with a handgun, and he claimed that her sexual acts were performed voluntarily and that she had been paid for them. In fact, Edwards continued to disagree with the thrust of the government's version—the allegation that he pulled a gun on K.W.—even after he had answered in the affirmative the judge's question whether he was "able to admit that this act occurred as [the prosecutor] described." Moreover, Edwards repeated his denials of guilt to the writer of the PSI.

Although Dr. Levin's evaluation did not focus upon the transcript of the Rule 11 colloquy, I find the conclusion inescapable that if Edwards was as handicapped as Dr. Levin found him to be, then his affirmative response to a virtual abstraction—whether the prosecutor's account was accurate—did not constitute an intelligent and knowing acknowledgment that he forced K.W. to have sex with him. On a concrete level, Edwards denied the use of force and of a

---

**1.** *United States v. Masthers,* 176 U.S.App.D.C. 242, 539 F.2d 721 (1976). The court stated in *Masthers* that "the standard Rule 11 colloquy may prove an inadequate measure of the validity of a plea proffered by a defendant of questionable mental competence." 176 U.S.App.D.C. at 249–50, 539 F.2d at 728–29. *Masthers* also held that the competency standard for pleading guilty is more exacting than the standard for competency to stand trial. 176 U.S.App.D.C. at 247 n. 30, 539 F.2d at 726 n. 30; *accord, Williams v. United States,* 595 A.2d 1003, 1005 (D.C.1991). This aspect of *Masthers* was overruled in *Godinez v. Mor-*

*an,* 509 U.S. 389, 395 n. 5, 396–402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

**2.** I recognize that IQ is not an adequate substitute for an individualized and thorough inquiry into competency. "IQ alone . . . is not a definitive measure of retardation." *Masthers, supra,* 539 F.2d 721, 176 U.S.App.D.C. at 245 n. 16.

**3.** According to Dr. Levin, Edwards' "[s]pelling ability is only equal to [that of] a third grade student."

weapon whenever he was asked directly. His admissions of guilt, if admissions they were, presupposed a level of reasoning by analogy which, without a patient and careful explanation by counsel, would be beyond the capacity of the individual depicted in Dr. Levin's evaluation.

The experienced trial judge made commendable efforts to ensure that Edwards' plea was voluntary. I agree that we must also take into account the judge's provident warning to Edwards, at the conclusion of the Rule 11 colloquy, that if Edwards persisted in pleading guilty, he would not be permitted to withdraw his plea after the proceeding was over. The trial judge was on the scene, and his vantage point, for purposes of assessing Edwards' understanding of the proceedings, was superior to ours. Finally, Edwards' responses to some of the court's inquiries come across as more rational and focused than one might expect from an individual as handicapped as Dr. Levin supposed Edwards to be, and this may have been even more apparent to the trial judge, who was able to observe the defendant during the proceedings.

But at the time that Edwards entered his plea, the judge had not been apprised of Edwards' brain damage or his impaired cognitive functioning.[4] Mentally retarded people, and others with impaired cognitive abilities, are often predisposed to answer questions in a way that is designed to conceal their lack of understanding, so that "even when [their] language and communication abilities appear to be normal, the questioner should give extra attention to determining whether the answers are reliable." James W. Ellis and Ruth A. Luckasson *Mentally Retarded Criminal Defendants,* 53 GEO. WASH. L.REV. 414, 428 (1985). For these reasons, we have held that the judge may not rely exclusively on his personal observation of the defendant as a basis for finding that his plea was

knowing and voluntary. *See Hunter, supra,* 548 A.2d at 810–11; *Pierce supra,* 705 A.2d at 1091–92.

In sum, in light of Dr. Levin's assessment and Edwards' related allegations, I do not believe that it was possible to determine without a hearing whether Edwards' decision to enter his plea was voluntary, knowing and intelligent. Accordingly, I would vacate the order appealed from and remand the case to the trial court for a hearing on Edwards' motion. At the hearing on remand, the prosecutor would be able to cross-examine Dr. Levin, the government would have the opportunity to present contrary expert testimony if it elected to do so, and the dispositive determination—whether manifest injustice has been established—could then be made on a more comprehensive and meaningful record.

---

**4.** Edwards alleged in his motion to withdraw the plea that his plea attorney was at fault in

this regard.