**Eric R. WALLACE, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 04–CF–299, 05–CO–1328.

District of Columbia Court of Appeals.

Argued Dec. 20, 2006.

Decided Sept. 13, 2007.

J. Alex Ward, with whom David A. Handzo appeared on the brief, for appellant.

Robert E. Leidenheimer, Jr., Assistant United States Attorney, with whom Ken-

neth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, David B. Goodhand, Michael T. Ambrosino, and James S. Sweeney, Assistant United States Attorneys, appeared on the brief, for the appellee.

Before FARRELL, RUIZ and THOMPSON, Associate Judges.

Thompson, Associate Judge:

After accepting a guilty plea from appellant Eric R. Wallace, the trial court found Wallace guilty of second-degree murder and sentenced him to thirty-five years in prison, to be followed by five years of supervised release. Wallace contends that the court erred in finding that he was competent to stand trial and to enter a guilty plea, and that the trial judge abused her discretion in denying his motion to withdraw his guilty plea. He argues in the alternative that his sentence must be vacated because it was based on uncorroborated and unreliable information.

We agree with the trial judge that this is a difficult case. However, finding no clear error or abuse of discretion in the court's rulings, we affirm Wallace's conviction and deny the requested relief.

**Background**

During early 2002, doctors at St. Elizabeths Hospital found appellant incompetent to stand trial in three misdemeanor assault cases that were then pending. The government thereafter petitioned to have appellant civilly committed. Appellant opposed the government's request that he be held at St. Elizabeths pending resolution of the commitment petition, and he was released on October 10, 2002. Later that same day, appellant encountered Claude McCants at 1108 4th Street, N.E., stabbed McCants in the neck, and drove away in McCants' vehicle, leaving McCants to bleed to death.

Relying on a court-ordered competency screening completed in November 2002, the court found appellant competent to stand trial for the murder of McCants. The court also ordered a criminal responsibility study, the results of which were summarized in a June 2003 report that concluded that "on or about October 10, 2002, ... [appellant] was not suffering from a mental disease or defect that substantially impaired his ability to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of the law." Notwithstanding, on August 12, 2003, appellant filed a motion asking the court to find him incompetent to stand trial and a notice of intent to rely on the insanity defense. In response, the court ordered the Legal Services Division of the Forensic Services Administration[1] to render an opinion as to the "present mental competency of [appellant] to stand trial."

Dr. Oliver performed the competency examination. In a letter dated September 29, 2003, he reported that although appellant "claimed to have no knowledge whatsoever of the judicial process and the roles of various court officials," his "presentation today appeared to be completely volitional." Dr. Oliver concluded that appellant was malingering.[2] After receiving his re-

---

1. As explained by Dr. Lawrence Oliver, a clinical psychologist employed by the Legal Services Division, the Division is "an agency that was established by an order of Congress to assist the court in issues of competency [and] criminal responsibility."

2. Malingering is "the willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury, done for the purpose of a consciously desired end." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 771–72 (26th ed.1981). The desired end can be "avoiding military duty, avoiding work, obtaining financial compensation, evading

port, the court scheduled a competency hearing, which was conducted over a five-day period between October 28 and November 4, 2003. Having heard the testimony of five expert witnesses and reviewed numerous written reports about appellant's mental status, the court ruled on November 10, 2003 that appellant was competent to stand trial.

■ When the parties were before the court again on January 5, 2004—the date set for commencement of trial—defense counsel informed the court that appellant "indicated again last night that he would like to accept the Government's plea offer." After a colloquy that resulted in the court's finding that appellant "understands the proceedings and is competent to proceed," the court accepted appellant's unconditional plea of guilty to one count of Second Degree Murder While Armed. At a *Frendak*[3] hearing on January 15, 2004, the court also found that appellant "understands the consequences of the choice to waive the [insanity] defense" and that his "waiver is voluntary and intelligent." The court sentenced appellant on February 27, 2004, and appellant filed his notice of appeal on March 26, 2004. On August 19, 2004, he also moved to withdraw his guilty plea, and his appeal was stayed pending resolution of that motion. By order dated

October 27, 2005, the trial court denied the motion to withdraw and appellant noted an appeal from the denial order. We consolidated the two appeals.

## Analysis

### I.

■ The government urges that we must dismiss appellant's direct appeal. We agree that our case law requires this result. We have said that "as a practical matter virtually every possible avenue of appeal is waived by a guilty plea," *Bettis v. United States*, 325 A.2d 190, 194 (D.C. 1974), and that "the only issues that are appropriately raised in an appeal from a conviction entered after a guilty plea are the exercise of jurisdiction by the trial court and the legality of the sentence imposed." *Carmichael v. United States*, 479 A.2d 325, 326 n. 1 (D.C.1984) (citing *Lorimer v. United States*, 425 A.2d 1306, 1308 (D.C.1981) (per curiam)). We have recognized that "a defendant who is sentenced after pleading guilty may later attack the voluntary and intelligent character of the plea," *McClurkin v. United States*, 472 A.2d 1348, 1352 (D.C.1984), but have held that "the appropriate method for challenging the voluntary and intelligent character of a guilty plea is by a Rule 32(e) motion to withdraw."[4] *Lorimer*, 425 A.2d at 1309.[5]

criminal prosecution, or obtaining drugs." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 739 (4th ed.2000).

3. *See Frendak v. United States*, 408 A.2d 364 (D.C.1979). Through a *Frendak* inquiry, the trial court must assure itself that the defendant understands the consequences of failing to assert the insanity defense, is fully informed of the alternatives available, and freely chooses to waive the insanity defense. *See id.* at 380.

4. Super. Ct.Crim. R. 32(e) provides that:
 A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sen-

tence is suspended; but to correct manifest injustice, the Court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea. *Id.*

5. Appellant argues that the preclusion of his direct appeal amounts to a holding that he waived the issue of competence, a result that he contends conflicts with the Supreme Court's admonition, in *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his [competence]." *Id.* at 384, 86 S.Ct. 836. In *Pate*, however,

■ As appellant points out, some jurisdictions have determined to "treat appeals of competency determinations as an exception to the ... rule" that "a voluntary guilty plea waives all nonjurisdictional defects in the proceedings leading up to the plea." *State v. Cleary,* 175 Vt. 142, 824 A.2d 509, 512 (2003).[6] This court, by contrast, has "refus[ed] to exercise our jurisdiction to hear a challenge to a guilty plea" outside the context of an appeal from denial of a motion to withdraw a guilty plea, *Lorimer,* 425 A.2d at 1309 n. 6, with the objective of "reduc[ing] the great waste of judicial resources required to process frivolous attacks on guilty plea convictions." *Id.* (internal quotation and citation omitted).[7] Even were we free to depart from that practice in this case, we would have no reason to do so, because, as noted, appellant did in fact move in the trial court for leave to withdraw his plea, and we have before us his appeal from the trial court's decision denying that motion.

■ After the imposition of sentence, as in this case, a court will allow the withdrawal of a guilty plea only "to correct manifest injustice...." Super Ct.Crim. R. 32(e).[8] To meet this burden, appellant

the Supreme Court was concerned with "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial," a deprivation of due process. *In re W.A.F.,* 573 A.2d 1264, 1266 (D.C.1990). In other words, *Pate* established that a defendant is entitled to procedural due process to determine whether he is competent. Here, appellant does not assert that procedural protections were lacking; we think he could not legitimately do so, as the court ordered two competency assessments and conducted an extended competency hearing, at which the trial judge repeatedly gave counsel latitude to pursue questioning and took pains not to "squeeze anybody out." Appellant's challenge is rather to the *outcome* of the competency determination. Nothing in *Pate* compels a holding that a defendant who has received the benefit of such proceedings must be allowed to challenge his competency again on direct appeal following a guilty plea.

6. Other courts have reasoned that because a defendant's mental incompetence undercuts a state's authority to proceed to trial, a claim that the defendant was incompetent is a claimed jurisdictional defect that is not waived by a guilty plea. *See, e.g., People v. Parney,* 74 Mich.App. 173, 253 N.W.2d 698, 699–700 (1977) ("[D]efendant's later guilty plea did not waive the alleged error arising from the prior competency determination.").

7. Appellant suggests that this court's approach is inconsistent with *Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975). Menna was indicted for and pled guilty to refusing to answer questions before a grand jury after he had already been sentenced to a jail term for civil contempt for the same refusal to testify. The Supreme Court reversed his conviction, reasoning that where "the claim is that the State may not convict petitioner no matter how validly his factual guilt is established," a "guilty plea ... does not bar the claim," *id.* at 63, 96 S.Ct. 241 and admonishing that "[w]here the State is precluded by the [double jeopardy clause of the] United States Constitution from haling a defendant into court on a charge, federal law requires that a conviction on that charge be set aside even if the conviction was entered pursuant to a counseled plea of guilty." *Id.* at 62, 96 S.Ct. 241. However, *Menna* involved the very power of the state to "hal[e] a defendant into court on a charge." *Menna,* 423 U.S. at 62, 96 S.Ct. 241; *see also Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), a case where "the constitutional infirmity in the proceedings lay in the State's power to bring any indictment at all" and the "very initiation of proceedings against [the defendant] ... operated to deny him due process of law." *Id.* at 30–31, 94 S.Ct. 2098. By contrast, when a defendant's competency is in issue, the issue is not the government's power to indict but the defendant's ability to assist in his defense at trial or to enter a knowing and voluntary plea. *Menna* and *Blackledge* do not dictate that in this circumstance the defendant must be able to bring a freestanding appeal of the competency determination as though he had never pled guilty.

8. *See Edwards v. United States,* 766 A.2d 981, 988 n. 10 (D.C.2001) (noting that a post-

must establish either that "there was a fatal defect in the Rule 11 [plea] proceeding when the guilty plea was taken," or that "justice demands withdrawal under the circumstances of the case." *Pierce v. United States,* 705 A.2d 1086, 1089 (D.C. 1997).[9] We review a trial court order denying a Rule 32(e) motion to withdraw a guilty plea for abuse of discretion. *See Carmichael,* 479 A.2d at 327. In light of the procedural history of this case, our review here will largely entail application of a "clear error" standard, as we now explain.[10]

▉▉▉ Appellant first attempts to meet the burden of establishing that "justice demands withdrawal" of his guilty plea by showing that he was mentally incompetent at the time of the plea. *See Willis v. United States,* 468 A.2d 1320, 1323 (D.C. 1983) ("Having failed to show that he was mentally incompetent, [appellant] has also failed to meet his burden of proving manifest injustice."). He attempts to make that showing by challenging the validity of the trial court's determination that he was competent to stand trial. *See Godinez v. Moran,* 509 U.S. 389, 400–01, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (holding that the competency required to plead guilty is the same as the competency required for standing trial). Accordingly, we are compelled to consider whether the trial court's November 10, 2003 competency determination is "supported by the record," *Bennett v. United States,* 400 A.2d 322, 325 (D.C. 1979), or whether the trial court clearly erred when it determined on November 10, 2003 that appellant was competent to stand trial[11] (or when it relied on that conclusion in accepting Wallace's guilty plea on January 5, 2004, without any further hearing on competency).

▉▉▉ Appellant next argues that the Rule 11 plea proceeding was defective because, regardless of his mental competen-

sentencing motion to withdraw a guilty plea is reviewed under the stringent "manifest injustice" standard rather than under the more liberal "if for any reason the granting of the privilege seems fair and just" standard applicable to a pre-sentencing motion to withdraw a plea); *Binion v. United States,* 658 A.2d 187, 191 (D.C.1995) (same). We have held that "[i]f it appears that a defendant [who has filed a Rule 32(e) motion] ... did not knowingly plead, then 'manifest injustice' warranting withdrawal of the plea will generally be found." *Carmichael,* 479 A.2d at 327. We have also recognized that "[a] defendant's mental competency," one of the issues that appellant raises here, is "closely related to his ability knowingly to enter a plea." *Id.*

9. Elsewhere we have said that both prongs of this test must be met: "In order to withdraw a plea, the movant must not only demonstrate that the plea was manifestly unjust, *but must also show* that 'the plea proceeding was fundamentally flawed such that there was a complete miscarriage of justice.'" *Edwards,* 766 A.2d at 987 (emphasis added) (quoting *Williams v. United States,* 656 A.2d 288, 293 (D.C.1995).) We need not resolve which ar-

ticulation is the more accurate statement of the law because, as explained *infra,* we conclude (with some difficulty) that appellant has not met either prong of the test.

10. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (noting that a court "would necessarily abuse its discretion if it based its ruling on ... a clearly erroneous assessment of the evidence").

11. "A finding of competency will not be set aside upon review unless it is clearly arbitrary or erroneous." *Bennett,* 400 A.2d at 325 (internal quotation marks and citation omitted). The "clearly erroneous" standard applies because a trial court's competency determination is largely a factual determination, *see United States v. Izquierdo,* 448 F.3d 1269, 1278 (11th Cir.2006) ("A [trial] court's competency determination is primarily factual in nature.") and *United States v. Villegas,* 899 F.2d 1324, 1341 (2d Cir.1990) ("A defendant's competence to stand trial is a question of fact ....."), which must be accorded "great deference." *Bennett,* 400 A.2d at 325.

cy, he did not actually understand the significance of the proceeding and the rights he was waiving. We therefore have the task of determining whether the trial court clearly erred in finding that appellant made his guilty plea knowingly.[12] *See Johnson v. United States,* 631 A.2d 871, 878–79 (D.C.1993) (Farrell, J., concurring) (noting that the clear error standard prescribed by D.C.Code § 17–305(a) applies to review of the trial judge's findings based on a defendant's statements during a plea inquiry).

## II.

As already noted, appellant contends that "justice demands withdrawal" of his guilty plea because of his lack of mental competency. He argues that the evidence presented at his competency hearing—his diagnoses of cognitive impairment and "dementia due to seizure disorder and insulin-dependent diabetes," and the fact that "six different doctors independently determined that [he] was not competent to stand trial"—either taken alone or viewed in conjunction with post-competency-hearing evidence presented with his motion to withdraw, compels a conclusion that he was incompetent to stand trial and to plead. We consider these arguments in section II.A. *infra.*

Appellant also asserts that he "was obviously confused throughout the plea proceedings" and that the trial judge abused her discretion, both in accepting his guilty plea and in denying his motion to withdraw the plea, in the face of his repeated asser-

tions about self-defense, lack of excessive force, and the insanity defense. We address these arguments in section II.B. *infra.*

### A. Appellant's Competence to Stand Trial or Plead Guilty

 "Constitutional due process requires that a criminal defendant be mentally competent for a trial to proceed." *Higgenbottom v. United States,* 923 A.2d 891, 897 (D.C.2007) (citation omitted). In a competency proceeding, the relevant inquiry is whether a defendant has a rational and factual understanding of the proceedings against him and whether he can consult with his lawyer and assist in preparing his defense. *See id.; see also Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) (establishing the requirements of rational and factual understanding and competent consultation with a lawyer) and *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (requiring a defendant to be able to "assist in preparing his defense").

### 1. Evidence Presented at the Competency Hearing

At the competency hearing in this case, appellant presented evidence that he had long suffered from Type I diabetes, causing him to experience erratic and abnormal swings in his blood sugar, and that he also had a long history of epileptic seizures. Dr. Thomas Hyde, a board-certified neurologist who examined and tested appellant on April 23, 2002, and October 6,

---

12. As appellant notes, "[t]he focus of a competency inquiry is the defendant's mental capacity [*i.e.,*] whether he has the ability to understand the proceedings." *Godinez,* 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (emphasis removed). The focus of a Rule 11 " 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand...." *Id.* (emphasis in original);

*see also id.* at 400–01, 113 S.Ct. 2680 ("In addition to determining that a defendant who seeks to plead guilty ... is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary.... In this sense there is a 'heightened' standard for pleading guilty ..., but it is not a heightened standard of competence." (internal citations and emphasis omitted)).

2003, testified that "due to poorly controlled seizures and repeated hypoglycemic insults to the brain over the years," appellant was in a "cognitively impaired state" and had "significant impairment in neurological function, especially in domains of attention and memory" that "would impair his ability to understand the proceedings that he would be involved with, and to participate and work with his counsel in an effective manner" and that "render him incompetent from the medical/legal standpoint." Dr. Hyde also testified that appellant's "Full Scale IQ was found to be 55" and that "people who are below 60 are really quite significantly impaired."

Dr. David Pickar, a psychiatrist,[13] met with appellant on three different occasions—January, April, and September of 2003. He testified that appellant demonstrated perseveration, a symptom of frontal lobe dysfunction. Dr. Pickar also testified that during his September 2003 evaluation of appellant, he explored at some length appellant's understanding of the legal process. He found appellant "unable to understand the fundamental nature of the defense-prosecution, defendant relationship" and "[u]nable to understand relationship with defense attorney." Dr. Pickar did not think that appellant "got [*i.e.,* comprehended] the idea of pleading guilty." Dr. Pickar concluded that appellant "does not have sufficient understanding of the legal process, or the ability to work appropriately with counsel in the context of a central nervous system disorder that involves dementia, probably secondary to epilepsy; and that he is not competent to stand trial, and that the deficits that are germane to this conclusion are not related to malingering."[14]

The government's experts did not dispute that appellant had some degree of cognitive impairment. Dr. Raymond Patterson,[15] a forensic psychiatrist who had

---

13. Dr. Pickar also spoke with appellant's family, interviewed doctors that treated appellant at St. Elizabeths, and reviewed appellant's medical records.

14. The court also had before it the opinions of doctors who had performed the criminal responsibility examination during the spring of 2003 and doctors who had examined appellant during the time that he was evaluated at St. Elizabeths Hospital for the purpose of determining whether he was competent to stand trial in his misdemeanor cases. On May 5, 2003, Dr. Sidney Binks, a neuropsychologist, reported that appellant's test scores "suggested significantly impaired cognitive functioning comparable to those of a group of elderly individuals with dementia" and concluded that appellant "did not malinger." On January 2, 2002, psychologist Dr. Anita Boss stated that appellant was "unable to participate in court proceedings at this time" and that "it is unclear if his condition will significantly improve and a minimum of 30 to 45 days is recommended before re-evaluation." On January 30, 2002, Dr. Michele Piquet stated that appellant was "not competent to stand trial because cognitive factors substantially impair his capacity to have a factual and rational understanding of the proceedings against him, and to properly assist counsel with preparation of his defense." In a letter dated March 27, 2002, the Forensic Inpatient Services Division ("FISD") of the District of Columbia Department of Mental Health reported that it was "too early in treatment program to determine the likelihood of Mr. Wallace attaining competency in the foreseeable future." On May 24, 2002, FISD reported that it was "unlikely that Mr. Wallace will attain competency in the foreseeable future." On June 26, 2002, psychologist Dr. Mitchell Hugonnet stated that appellant's "judgment was severely impaired," that he was diagnosed with dementia due to diabetes and epilepsy, and that he was "unable to manage the basic concepts associated with competency to stand trial."

15. Dr. Patterson examined appellant only once. He also spoke with two of appellant's treating physicians and several individuals that supervised appellant at both the mental hospital and the jail, and reviewed "quite a lot of records" from "every expert [that] has testified...." In addition, he observed that

completed several hundred competency examinations, testified that he "had no conflict" with tests showing that appellant had some degree of neurological damage and acknowledged that "there might be some mild dementia," but stated that this "does not mean that [appellant] does not have the ability ... to exaggerate as much as he might think he should to convince people that he doesn't know what's going on." Dr. Patterson opined that appellant "certainly was malingering" and "certainly was ... exaggerating symptoms ... when they said he had an IQ of 55, because I simply don't believe he has an IQ of 55." Dr. Patterson cited specific examples of appellant's malingering: "choosing how [he] respond[s] based on who [he's] talking to"; appellant's "ridiculous" response to a question about the colors of the American flag, a question that even mentally retarded individuals and people with serious mental illness "don't miss"; appellant's claim to hear voices but his ability to concentrate and his lack of distraction, which are inconsistent with that affliction; and his exhibiting "high-level" planned behavior, such as injecting himself with insulin to get medical attention in the emergency room faster than other people.

Dr. Patterson further testified that appellant's behaviors inconsistent with an IQ level of 55 included acting as a "predator" while at St. Elizabeths but not while in jail, where appellant appeared to be "normal," like "any other inmate who is not receiving mental health services." Dr. Patterson agreed with a statement in a discharge summary, attributed to Dr. William Richie, one of appellant's treating psychiatrists at St. Elizabeths, that appellant was "capable of dissimulating, fabricating, prevaricating

and malingering cognitive disabilities in excess of his documented deficits." Noting that the issue was "whether or not [appellant] understands, rationally and factually these proceedings, the charges against him, the consequences; and can he, does he have the ability to assist his attorney," Dr. Patterson stated that "In my view, he has both of those." Dr. Patterson thought that appellant's case was "not a close call at all," explaining that "when [appellant] adheres to his treatment regime, seems to do pretty well. When he doesn't, he runs into problems. The latter, in my view, are very much and directly related to his attempts to not have this matter go forward, and in part because he has been in a position where precisely that has happened before."

Dr. Steven Lally, a clinical and forensic psychologist who had previously conducted between 200 and 250 competency evaluations,[16] spent 7½ to 8 hours with appellant at the D.C. Jail on October 24, 2003. Dr. Lally administered a neuropsychological screening test that showed that appellant was "performing in the moderate to severely impaired range." Dr. Lally also administered a test for memory malingering that "did not disclose malingering." Dr. Lally explained that the tests showed that appellant was "answering in a ... sort of careless random fashion," the reason for which the test cannot explain. Dr. Lally concluded that one "should not put a lot of credibility [sic] in terms of [appellant's] performance in psychological tests." With respect to one of the tests, Dr. Lally also explained that "if [the] test does not indicate malingering, it does not mean that the individual is not malingering. In other words, it's a test that's very effective when

---

"being here in the courtroom and hearing [appellant's] capacity to render information when he chooses to [was] also quite helpful" to him in evaluating appellant's competence.

**16.** Dr. Lally also spoke with Dr. Hugonnet of St. Elizabeths and with appellant's long-time girlfriend, and reviewed records from a number of sources.

it does indicate malingering. But studies have shown that a number of malingerers ... don't necessarily get caught with the [test]."

On the basis of an interview with appellant, Dr. Lally concluded that appellant's behavior was inconsistent with the degree of impairment that appellant claimed, but was consistent with malingering. Dr. Lally noted that when he would stop taking notes during a meeting with appellant, appellant's speech became more spontaneous and his answers more accurate. Further, appellant mixed symptoms of various disorders and failed to remember details of the crime unless the detail was exculpatory. Dr. Lally testified that although appellant reported "hearing voices," his symptoms were inconsistent with that condition. The symptoms that appellant reported were also inconsistent from one doctor's visit to the next, which Dr. Lally explained was a sign of malingering because malingerers "don't always know how to respond." Dr. Lally concluded that appellant was malingering "both psychotic symptoms and also some degree of cognitive impairment."

Dr. Oliver testified that he found "inexplicable inconsistencies" between the November 2002 and September 2003 interviews he conducted with appellant.[17] During both interviews, appellant exhibited a good memory, was able to recite telephone and social security numbers, and could give background details. During the September 2003 interview, however, in contrast with the November 2002 interview, appellant had no knowledge about the charges and legal issues discussed. Unable to explain the differences

in appellant's behavior, Dr. Oliver concluded that appellant was intentionally producing symptoms.

## 2. The Trial Court's Competency Ruling

■■■ Upon this evidence the trial court found that there was "no doubt that Mr. Wallace suffers some cognitive deficits," but that it was "evident from the record" that these impairments do not "preclude him from the rational understanding of the charges and proceedings against him," "nor do they preclude him from consulting with his lawyers." The court concluded that appellant is "malingering and remains competent to stand trial in this case."

Appellant accuses the trial court of "look[ing] past the mountain of scientific evidence showing the [appellant's] incompetence" and "seiz[ing] upon a red herring: the prosecution's charges of 'malingering'...." We are satisfied, however, that the trial judge did not ignore or overlook appellant's evidence of impairment.

First, acknowledging the conflicting evidence, the court told the parties that "this is a difficult difficult case." Second, explaining its finding that appellant was malingering, the trial court specifically relied on the testimony that, on one of the tests for malingering, appellant gave "careless responses which invalidated the test results," and that even when an individual "passes" a malingering test "it does not mean you do not have malingering. It just means they didn't choose to do it in a way that is detected in [the] test." Appellant emphasizes the evidence that he "passed" two tests designed to detect malingering and asserts that the court's finding that he

17. Dr. Oliver had performed "somewhere around 4000" competency evaluations, and had found in more than half the cases that the person evaluated was incompetent. By contrast, Dr. Hyde testified that he had previously been retained on only five or six occasions to examine the issue of competency, always by the defense, and had testified on competency on two or three occasions.

was malingering cannot be squared with the evidence, but the trial judge's explanation identified evidence that, we agree, supports her conclusion.

Third, the trial court's finding that appellant was competent to stand trial is not plainly contrary to the neurological evidence of appellant's impairment. The defense and prosecution experts agreed that cognitive impairment does not necessarily mean incompetence: Dr. Hyde acknowledged that an individual with organic brain damage can be competent, and Dr. Patterson testified that cognitive impairment and brain damage do not necessarily render someone incompetent to stand trial and that a person's having dementia does not

mean that he is incompetent. Further, there was no consensus, even among defense experts, that appellant suffered from psychosis or any other mental illness.[18]

Appellant suggests that the trial court should have given more weight to the competency determinations by doctors who saw appellant over the course of his several-month-long inpatient stays at St. Elizabeths than to the views of the doctors who saw appellant on fewer, more abbreviated occasions. However, in exercising her discretion, the trial judge was entitled to credit the view of the government's experts that those doctors simply "got it wrong."[19] *Cf. United States v. Chischilly,*

---

18. Appellant exhibited "psychotic symptomatology" during Dr. Hyde's visit with him during October 2003, but Dr. Hyde had "not formed a final opinion about" whether appellant had a mental illness. Dr. Pickar believed that appellant experienced auditory hallucinations, but was uncertain as to whether appellant was suffering from psychosis. Dr. Oliver opined that appellant was not mentally ill.

We note that in a December 16, 2003 report, the District of Columbia Commission on Mental Health referred to appellant's "mental illness" but appears to have utilized that term synonymously with the term "dementia." At one point in its report, prepared after the Commission heard testimony from St. Elizabeths staff psychiatrist Dr. William Richie, the Commission stated that appellant "has difficulty attending to daily needs without supervision due to his [mild to moderate] dementia." At another point in its report, the Commission summarized Dr. Richie's views that "one factor that would cause [appellant] to injury [sic] himself or others is his mental illness," which "impairs his ability to care for himself, including his medical care. The cognitive deficits caused by dementia will more likely cause respondent to engage in activities that will injure others." Elsewhere, dementia has been distinguished from mental illness. *See, e.g.,* 70 Fed.Reg. 4194, 4216 (2005) (Department of Health and Human Services Medicare program rulemaking notice distinguishing "mental illness" from "cognitive impairments such as Alzheimer's disease or other dementias"); 62 Fed.Reg.

67174, 67201 (1997) (Department of Health and Human Services rulemaking notice stating that "a person with a primary diagnosis of dementia would not be considered to have mental illness").

19. It is clear from the record that the trial judge considered whether to give special weight to the views of St. Elizabeths doctors who saw appellant regularly while he was housed there. During the competency hearing, the following exchange took place between the court and Dr. Patterson:

The Court: In reviewing what records I have been able to see, there's a big hole here in the background. I've got a year where [appellant] is at the hospital where their-a sophisticated staff is working with him, and they are concluding that not only is he incompetent, but he's not likely to regain competence.

The Witness: Yes.

The Court: And then bingo, he comes in, in October, like one day after he's released under that finding, and he's suddenly competent.

The Witness: Yes.

The Court: How do you evaluate that?

The Witness: I think, frankly, that they got it wrong; that the presentation for Mr. Wallace and the blurring of the lines and that's, in part, what makes it difficult, because Mr. Wallace does have diabetes, and Mr. Wallace does, it appears, to have had a seizure disorder for some time.

30 F.3d 1144, 1150 (9th Cir.1994) ("[t]o the extent that [the trial judge], from his courtroom observations, assigned more weight to the Government's expert than to the contrary, ... he was acting within his discretion to do so as a part of his fact-finding and credibility-weighing functions."). In some instances, this court accords greater weight to the opinions and diagnoses of a treating physician than to the opinions of non-treating physicians who have been engaged to provide medical evaluations. *See, e.g., Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 926 A.2d 140, 146 (D.C.2007) (noting that the law affords the diagnosis of a treating physician more weight than the conflicting opinion of a non-treating physician in a worker's compensation determination); *Kralick v. District of Columbia Dep't of Employment Servs.*, 842 A.2d 705, 711 (D.C.2004) (same, citing case authority). However, with respect to competency determinations in criminal cases, neither this court nor others have required deference to treating physicians or to doctors who saw a defendant on multiple occasions as an inpatient.[20]

Moreover, even if the trial court had given special weight to the views of appellant's treating physicians, no different result would have been required. None of the experts who testified at the competency hearing were appellant's "treating physicians." But Dr. William Richie was one of appellant's treating psychiatrists at St. Elizabeths, and the St. Elizabeths discharge summary discussed at the competency hearing attributed to Dr. Richie the statement that appellant "has [a] selective memory and is capable of dissimulating, fabricating, prevaricating and malingering cognitive disabilities in excess of his documented deficits."[21] And although other doctors who saw appellant on an inpatient basis at St. Elizabeths in 2002 and 2003 opined that he was unable to participate in court proceedings or to assist counsel with his defense, see *supra* note 14, experts appear to agree that an individual who is mentally incompetent to stand trial at one point in time may be competent to stand trial at a later time. For example, while Dr. Boss found appellant incompetent to participate in court proceedings in January 2002, she also commented that it "may be useful for Mr. Wallace if defense counsel can spend even more time with him to go over the details of his cases and legal

So you take those, and if you are not real careful, you can make a jump, a leap, in my view, that he's got such significant brain damage or impairment that he's not competent, and won't be competent. I frankly don't understand it.

I think it was a mistake. And I think that that mistake is borne out by his level of functioning that's seen not just in October and November, but also seen when he's interviewed by some of the experts in this matter, and the information that he provides.

**20.** As the United States Court of Appeals for the Fourth Circuit has explained:

[A] district judge's discretion in these matters properly includes the power to discount [the testimony of the defendant's personal physician]. He might find a treating physician's testimony unpersuasive because he lacks confidence in the physician's qualifications or abilities. The trial judge must also weigh, implicitly or explicitly, a treating physician's candor and objectivity.... [R]ules developed by appellate courts in limiting the discretion of administrative law judges and administrative agencies—rules motivated in part by concerns about agency independence and bias—have little or no relevance to the exercise of discretion by a district court.

*United States v. Brown*, 821 F.2d 986, 990 (4th Cir.1987) (internal citation omitted).

**21.** In addition, Dr. Lally drew his conclusion that appellant was malingering, in part, from his conversations with Dr. Richie.

strategy. Multiple repetitions, in addition to frequent discussion, may help [him] recall what he needs to know in order to better inform his choices and ability to participate." *See also Carmichael*, 479 A.2d at 327 (noting that a doctor at St. Elizabeths had confirmed that Carmichael was incompetent to stand trial, "but three months later this same doctor reported that the subject's mental condition had improved enough so that he was fit to stand trial"). Notably, the record indicates that appellant did receive "competency training" while at St. Elizabeths. All of this is to say that even if the court had been required to accord special significance to the views of the St. Elizabeths doctors that appellant was incompetent to stand trial at the time the doctors expressed those views, deference to those doctors' views did not require the court to find that appellant was incompetent to stand trial in November 2003 or to enter a plea in January 2004.

The trial court weighed the evidence and found that "while ... there is dementia and impairment," the "evidence of malingering is far more powerful than the evidence of significant progressive deterioration." In essence, appellant's disagreement is with the weight the trial judge accorded to the conflicting expert opinions about competency.

To disturb the trial court's findings, however, this court would have to re-weigh the evidence. That we may not do.

■■■ Our case law is clear that when there is a plausible explanation presented by two competing groups of experts, the decision is one for the fact finder. *See Jackson v. Condor Mgmt. Group, Inc.*, 587 A.2d 222, 225 (D.C.1991) ("When a case turns on controverted facts and the credibility of witnesses, as this one does, it is peculiarly one for the [finder of fact]. The fact that some of the witnesses may be

experts does not alter this rule." (internal citation omitted)). This principle applies with respect to expert medical testimony just as it does to other expert evidence. *See Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 770 A.2d 965, 970 (D.C.2001) ("In evaluating conflicting medical testimony, as in weighing evidence generally, the hearing examiner has wide latitude. The examiner is entitled to draw reasonable inferences from the evidence presented, and her decisions are especially weighty when they involve credibility determinations." (internal quotation marks and citation omitted)). And it applies with respect to competency hearings just as it does to other proceedings. *See, e.g., Ray v. Duckworth*, 881 F.2d 512, 516 (7th Cir. 1989) (holding that "[b]ecause of the potential for divergent and often conflicting opinions on the issue of the defendant's competency, we must be careful to give due regard to the trial court's superior ability to draw the appropriate inferences from its observation of the defendant and expert witnesses, as well as the examination reports before it," and noting that the trial court was making a "credibility determination" when it chose to believe the expert opining that appellant was malingering).

In this case, the trial court was presented with "two permissible views of the evidence as to competency...." *Villegas*, 899 F.2d at 1341. "[T]he court's choice between them cannot be deemed clearly erroneous." *Id.; see also Izquierdo*, 448 F.3d at 1278 (same). We can find no clear error in the court's November 2003 determination that appellant was competent to stand trial. Accordingly, appellant has not met the "substantial" burden he must meet to show that withdrawal of his plea was necessary to correct a manifest injustice. *Williams v. United States*, 595 A.2d

1003, 1006 (D.C.1991); *see also Higgenbottom*, 923 A.2d at 897 ("We review a court's competency determination ... for abuse of discretion, the exercise of which we will not lightly disturb." (internal quotation marks and citation omitted)).

### 3. The Court's Denial of the Motion to Withdraw in the Face of Post-Competency Hearing Evidence

■ Just before the plea proceedings commenced on January 5, 2004, the court was advised that appellant had been hospitalized for twelve days during December 2003. The court inquired of defense counsel whether he had "seen any significant difference in [appellant's] functioning since this latest episode in the hospital." Although defense counsel responded that he had not,[22] the information about appellant's post-competency-hearing hospitalization arguably raised anew the issue of appellant's competency. This court has held that "where the issue of a defendant's mental competence [has] been raised on the record, the trial court must conduct a specialized hearing to determine the competence of a defendant who seeks to plead guilty." *Edwards*, 766 A.2d at 988 (quoting *Hunter v. United States*, 548 A.2d 806 (D.C.1988)). The trial judge did not conduct a second competency hearing, and so we must address the issue of how this bears on appellant's motion to withdraw his guilty plea. The issue is an important one because the record reveals that appellant suffered a major seizure on December 18, 2003, and while hospitalized underwent an EEG that showed what Dr. Hyde, in a letter dated January 8, 2004, called "markedly abnormal brain activity."[23] And, in her November 10, 2003 competency ruling, the trial judge had specifically noted Dr. Hyde's testimony that "seizures can result in loss of consciousness and confusion in post seizure, as well as an impairment of cognitive function."

We addressed a similar situation in *Edwards*, where the court conducted a plea proceeding and accepted Edwards' guilty plea while "unaware of his diminished mental capacity," which was later documented in an evaluation by a clinical psychologist, Dr. Levin. Dr. Levin's evaluation described the substantial brain damage and marked changes in cognitive functioning that Edwards had sustained after a beating by police years earlier. *See* 766 A.2d at 984, 987. We noted that even though the trial court had been unaware of this history during the plea proceeding, the trial judge's denial of Edwards' post-sentencing motion to withdraw his plea "was informed by Dr. Lev-

---

**22.** Specifically, defense counsel responded, "No, Your Honor. My only visit with him after this episode was last night. As the Court knows, my view is that there are significant problems here. I can't say that I think they're more significant now than they have been. I'm not an expert on those things."

Similarly, during the proceedings on January 15, 2004, appellant's counsel informed the court that there was "no change in [appellant's] condition since we were here on the competency decision." The trial court referred to this information in denying the motion to withdraw.

**23.** Dr. Hyde's January 8, 2004 letter, which was initially presented to the court to support appellant's sentencing recommendation, was resubmitted as an exhibit to the motion to withdraw the guilty plea. In the letter, Dr. Hyde noted that appellant "was emergently transported from jail to Greater Southeast Community Hospital on December 18, 2003. He was admitted with diabetic ketoacidosis, a severe metabolic condition produced by out of control diabetes. In addition, he suffered a major seizure in the emergency room (due in part to a subtherapeutic blood level of Dilantin, his anticonvulsant medication). He was admitted to the hospital, where he remained for twelve days while his multiple metabolic problems were corrected."

in's evaluation." *Id.* at 988. We rejected Edwards' claim that the court had erred in denying his motion to withdraw, noting that the denial was "based primarily on [the trial judge's] personal observations of and conversations with Edwards, factors to which we accord great deference." *Id.* We also noted that Dr. Levin "never opined that Edwards was incompetent to enter a plea," *id.*, and that the trial judge had clearly considered Dr. Levin's report but rejected it as "unpersuasive on the issue of Edwards' competence at the time of the plea." *Id.* at 988 n. 10.

We reason similarly here. It appears that Judge Broderick was not aware of the details of appellant's December 2003 hospitalization and EEG at the time of the plea proceeding, but information about both did inform her denial of Wallace's motion to withdraw his guilty plea. Judge Broderick noted that appellant's EEG taken on December 24, 2003 "evidenced permanent and irreversible brain damage," that appellant had "a major seizure on December 18, 2003, eighteen days before his plea hearing," and that Dr. Hyde "found that [appellant] became confused for several days after 'a bout of severe seizures.'" However, like the trial judge in *Edwards,* Judge Broderick found the evidence relating to the December 2003 episode unpersuasive on the issue of competence, stating that "[n]o evidence was presented that there was a change in the Defendant's [competency] since the time of the competency findings." We find no clear error in the court's assessment. Even if we discount the lay opinions of defense counsel that there was no change in Wallace's functioning between the time of the competency hearing in November 2003 and January

2004, the record does not compel a conclusion that appellant's competency had diminished from November 2003 to January 2004.

As noted, Dr. Hyde's letter of January 8, 2004, interpreting appellant's December 24, 2003 EEG stated that the EEG showed "markedly abnormal brain wave activity, with slowing over the frontal lobes," consistent with "permanent and irreversible frontal lobe damage." But Dr. Hyde did not suggest in his letter that the new EEG showed that appellant was incompetent at the time of his plea.[24] Indeed, Dr. Hyde had earlier testified that an abnormal EEG does not mean that an individual is incompetent to stand trial, agreed that an EEG "look[ed] at . . . in isolation" does not tell much about competency, and explained that "it is possible [for an individual] to have both normal and abnormal studies." Also of particular note, Dr. Hyde had explained during the competency hearing that "you will see a lot of abnormalities in the post-seizure period." Taken together, Dr. Hyde's statements suggest that it was to be expected that appellant's EEG taken six days after his December 2003 seizure would show abnormal brain activity, and that no conclusion can be drawn from that EEG that appellant was less competent to enter a plea on January 5, 2004 (seventeen days post-seizure) than he had been at the time of the competency hearing.

Moreover, the December 2003 EEG appears to be cumulative of evidence already on the record. In his January 8, 2004 letter, Dr. Hyde referred to the 2003 EEG as providing "*additional evidence* of abnormal slowing over the frontal lobes" (emphasis added). This had already been shown "by other abnormalities on neurological examination reflecting his underly-

24. Rather, Dr. Hyde's letter outlined appellant's need for medical supervision while in custody and suggested that appellant's brain damage qualified as "statutory mitigation in the sentencing proceedings."

ing brain damage," including "clumsy fine motor movements with the left hand, bilaterial grasp reflexes, and poor complex motor sequencing in the hands bilaterally." Dr. Hyde testified about these same abnormalities at the competency hearing, stating that in April 2003, appellant had "clumsiness on a number of fine motor movements," and "'primitive reflexes,' often seen in individuals with frontal lobe dysfunction," and noting that "there ha[d] been some progressive brain damage" since appellant's 2000 EEG (which had also shown "bilateral slowing over the cerebella hemispheres").[25] Cf. Williams, 595 A.2d at 1005 & n. 2 (psychological report introduced at post-plea hearing had no bearing on defendant's competency because it added nothing to what was already known at the time of the plea).

Dr. Hyde's January 8, 2004 letter discussed not only appellant's December 24, 2003 EEG, but also the facts that appellant's "mental status fluctuates in response to his seizure disorder" and that appellant "often is confused for several days after a bout of severe seizures." It is not clear from the record whether appellant's December 18, 2003 seizure was part of a "bout of severe seizures," or whether, if appellant was confused after the December 18 seizure, that confusion (perhaps "several days" of confusion) had resolved or subsided by the end of his twelve-day hospital stay. However, in denying appellant's motion to withdraw, the trial judge emphasized that "[a]ll the evidence was considered," and one piece of important

additional record evidence was an evaluation by Dr. Lally, setting out his findings from a 2.75–hour interview of appellant that Dr. Lally conducted at D.C. Jail on December 31, 2003, i.e., after appellant had been discharged from Greater Southeast Community Hospital.[26] During this visit with appellant, Dr. Lally observed that appellant was "alert" and "oriented to person, place, and time" and that appellant's speech was clear and at a normal volume. Although appellant's "speech tended to be slower with lengthy delays in his response to questions" about court-related matters, there was "no evidence of a thought disorder in the form or content of his thinking." Appellant's "expression of affect was somewhat constricted, but generally appropriate." In short, this evaluation by Dr. Lally—the only expert evaluation in the record that is based on an interview of appellant after his December 2003 seizure but before his January 5, 2004 guilty plea—contained nothing that required the trial judge to conclude that appellant's competence to stand trial or plead guilty had diminished between the November 2003 competency hearing and the January 2004 plea proceedings.

■ We reach the same conclusion about the other new evidence that appellant presented with his Rule 32(e) motion. Appellant contends that his Bureau of Prison medical records generated since his guilty plea—one dated October 22, 2004, and the other dated January 7, 2005,—confirm that he is incompetent and not

---

25. With his motion to withdraw, appellant also presented a letter from St. Elizabeths neuropsychologist Dr. Sidney Binks, who stated that appellant suffers from dementia and severely impaired judgment, "suggesting a severely diminished ability to act within the confines of the law;" and a letter from Dr. William Richie, who treated appellant during

December 2003 and who also stated that appellant showed symptoms of dementia. This evidence, too, was cumulative.

26. Dr. Lally's evaluation was submitted to the court under cover of the government's January 5, 2004 "Notice of Expert Report Issued by Government's Expert."

malingering.[27] The trial judge refused to consider these records, reasoning that they were not relevant to appellant's competency during the plea. The trial court applied the appropriate standard. As the Supreme Court instructed in *Dusky,* it is a defendant's "present ability" that should be evaluated during competency evaluations. 362 U.S. at 402, 80 S.Ct. 788. The trial judge did not abuse her discretion in holding that appellant's mental evaluations on dates nine and twelve months after the guilty plea have little if any relevance on the issue of whether appellant was competent when he entered his guilty plea. *Cf. United States v. Collins,* 430 F.3d 1260, 1267 (10th Cir.2005) (noting that a defendant's competency can change over time) and *Rogers v. Snyder,* No. 00–007, 2001 WL 652032, *5, 2001 U.S. Dist. LEXIS 8866, *16–17 (D.Del.2001) (disallowing new evidence suggesting that petitioner was not competent to stand trial in March 1996 as it was not relevant to whether petitioner was competent to enter a guilty plea in 1993).

Finally, as we did in *Edwards,* we accord great deference to Judge Broderick's personal observations of and conversations with appellant, which informed her judgment that appellant was competent to plead guilty on January 5, 2004. The trial judge noted in her order denying the motion to withdraw that she "carefully assessed the Defendant at every question" during the plea proceeding and that "the Defendant's mental state was understood and considered by the Court at the time of the plea."

For all the foregoing reasons, we cannot conclude that the trial court abused its discretion in denying the Rule 32(e) motion to withdraw on the grounds of appellant's (claimed) mental incompetency to enter a plea.

### B. The Rule 11 Proceeding

■ The Rule 11 plea proceeding in this case was conducted on January 5, 2004. During a plea proceeding, the court must make inquiry and satisfy itself that "the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez,* 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (emphasis omitted). Appellant focuses on a number of exchanges that he argues evidence his "confusion" during the plea proceeding:

THE COURT: [Following an explanation of the insanity defense] All right. Now, do you intend to use that defense, insanity defense?

DEFENDANT: Yes.

THE COURT: Okay. If you go to trial, you're going to use that?

DEFENDANT: Yes.

THE COURT: Do you want to go to trial and use that defense?

DEFENDANT: Do I want to go to trial?

THE COURT: Yes.

DEFENDANT: I believe, yes. I believe so.

\* \* \* \*

THE COURT: Okay. Now, you've indicated today that you would like to enter a plea of guilty; is that correct?

DEFENDANT: Yes.

THE COURT: Now, if you enter a plea of guilty, Mr. Wallace, do you understand that you would not actually go to trial?

---

**27.** These medical records indicate that appellant has "cognitive deficiencies," "adult antisocial behavior," "chronic dementia," and "episodic delirium," and state that there was no evidence of "intentional suppression of his performance (malingering)."

DEFENDANT: I understand.

THE COURT: All right. And do you understand that you'd actually be admitting that you did, in fact, commit a murder?

DEFENDANT: Yes.

THE COURT: Okay. So, therefore, there wouldn't be any defense at that time?

DEFENDANT: Right.

THE COURT: So if you did that, if you entered a plea of guilty, then you wouldn't be using the insanity defense. Do you understand that?

DEFENDANT: Right.

THE COURT: Do you want to use the insanity defense?

DEFENDANT: Yes.

THE COURT: All right. Well, do you want to go to trial, then, or do you want to plead guilty?

DEFENDANT: Well, I would like to go to trial.

THE COURT: You would like to go to trial? All right. So you don't want to plead guilty to second-degree murder today?

DEFENDANT: No.

THE COURT: You want to have a trial with a jury?

DEFENDANT: Yes.

THE COURT: And have them decide?

DEFENDANT: Yes.

After a four-minute recess, defense counsel reported that appellant again indicated he would like to take the Government's plea offer. The following exchange ensued:

THE COURT: All right. Mr. Wallace here. All parties who were previously present are present again.

Mr. Handzo?

MR. HANDZO: Your Honor, we explained to Mr. Wallace again that he has the choice of taking the government's plea offer to Murder II or going to trial on Murder I and that if he accepts the Government's plea offer of Murder II, there will be no trial and no insanity defense or alternatively he could reject that and go to trial on the more serious offense of Murder I. He has again indicated that he would like to take the Government's plea offer.

THE COURT: Okay. All right. Let's proceed, then.

So, Mr. Wallace, you want to take the Government's plea offer; is that correct?

DEFENDANT: That's correct.

THE COURT: So that means you don't want to go and use the insanity defense; is that correct?

DEFENDANT: No.

THE COURT: No, you don't want to use it or, no, that's not correct?

DEFENDANT: No, I don't want to use it.

THE COURT: Okay. Do you understand that if you did go to trial, this is just if it did happen that you went to trial, okay, and you used the insanity defense, do you understand the Government would still have to prove first beyond a reasonable doubt that you committed the crimes that you've been charged with?

DEFENDANT: Yes.

THE COURT: And do you understand that even if you raise it, you could also raise other defenses, for example, self-defense.

DEFENDANT: Yes.

THE COURT: Do you understand that if you went to trial and used the insanity defense that that would only be considered if the jury found first you

were guilty beyond a reasonable doubt?

DEFENDANT: Yes.

\* \* \* \*

(Pause)

THE COURT: Now, after all we've talked about, do you still not want to raise the insanity defense, but instead wish to plead guilty?

DEFENDANT: Yes, that's correct.

THE COURT: All right. Why don't you tell me why you want to do that.

DEFENDANT: I guess just being able to see actually evidence that was supposedly used in this particular case.

THE COURT: So you're saying the evidence has convinced you that it's in your best interest to plead guilty?

DEFENDANT: I don't—don't say it that way. I haven't seen any evidence myself.

THE COURT: I'm sorry then. I'm just trying to understand your answer. Why do you want to plead guilty in this case?

DEFENDANT: It's just—been in courts for quite a while now, and I just like to—for anyone to actually show any evidence proving that I am guilty to just show that evidence.

THE COURT: Okay. Now, do you understand that if you plead guilty, the Government is going to tell you what they would have proven, but they're not going to be bringing in witnesses and things to testify.

Do you understand that?

DEFENDANT: Correct.

After the government's proffer of what the evidence would show, the court asked appellant to state what happened on the day in question. The following exchange occurred:

THE COURT: So what you're telling me, Mr. Wallace, is you were defending yourself? You're telling me you didn't commit a murder, you defended yourself? Is that what you're telling me?

DEFENDANT: I know I used a knife in this particular case.

THE COURT: Did you stab him in the neck?

DEFENDANT: It was in his neck.

THE COURT: And was it a sharp knife?

DEFENDANT: It was a butter knife.

THE COURT: Was it a sharp butter knife?

DEFENDANT: No.

THE COURT: Well, then how did it stab his neck?

DEFENDANT: That's what I wanted to know also, and I was—while using the vehicle—

THE COURT: Why did you feel you had to use a knife, Mr. Wallace?

DEFENDANT: You say why?

THE COURT: Yes. Why didn't you just punch him back?

DEFENDANT: Well, I was on the ground myself, and I know I was suffering from low blood sugars myself. I was real just—just wanted to eat the—my hamburgers that I had.

THE COURT: Well, this is more than 15 minutes after you saw him the first time and you still hadn't eaten your hamburgers?

DEFENDANT: I didn't get them all. I was just chewing on them. I didn't actually finish them.

THE COURT: Mr. Wallace, are you telling me that this was self-defense? Are you telling me that?

DEFENDANT: The knife was used in this case.

THE COURT: Are you telling me you used more force than you had to use by using the knife.

DEFENDANT: I guess that didn't have to be used. I don't think—no, I'm not saying that.

THE COURT: You're not saying what?

DEFENDANT: It could have been done, I guess, getting right back up and catching the guy and punching him back, I guess.

THE COURT: All right. So you used more force than you had to use? Is that what you're saying?

DEFENDANT: I guess so. . . .

THE COURT: Are you pleading guilty in this case because you did, in fact, stab this gentleman with t[o]o much force?

DEFENDANT: I don't think too much force was used.

THE COURT: Let's go back. You said you didn't have to do the stabbing, right?

DEFENDANT: I didn't have to use it.

THE COURT: Right, that's what I mean. Did you do that? Did you stab him when you didn't have to?

DEFENDANT: I guess so.

THE COURT: You guess so or are you sure?

DEFENDANT: Yes. Yes.

THE COURT: Are you sure about that?

DEFENDANT: Yes.

THE COURT: Is that why you pleaded guilty?

DEFENDANT: Yes.

Finally, appellant focuses on the following portions of the transcript from the January 15, 2004 *Frendak* hearing:

THE COURT: When you were here last time, Mr. Wallace, we talked about whether or not you would give up your right to an insanity defense. Do you know what I mean by that?

DEFENDANT: Yes.

THE COURT: Do you still want to do that?

DEFENDANT: No.

THE COURT: You don't want to give up your right?

DEFENDANT: No.

. . .

THE COURT: . . . Let me ask the question in a different way okay, Mr. Wallace?

DEFENDANT: Okay.

THE COURT: What I mean by an insanity defense is that you would go to trial and you would try to convince the jury that you didn't-you are not guilty of this crime because you were insane at the time. Do you want to go to trial and try to convince the jury that you were insane at the time?

DEFENDANT: No.

To summarize, in the exchanges that appellant now highlights, appellant told the trial court that he wanted both to plead guilty and to pursue an insanity defense, both to plead guilty and to have a jury trial, and both to enter a guilty plea and to put the government to its proof.[28] He both pled guilty and appeared to assert a claim of self-defense and lack of excessive force. Although he eventually stated affirmatively that he stabbed McCants when he did not need to do so, this answer was preceded by the equivocal response that he "guess[ed]" he had done so. In addition, his answers to some of the court's ques-

---

**28.** *Cf. Gooding v. United States,* 529 A.2d 301, 311 (D.C.1987) (concluding that pre-sentencing withdrawal of appellant's guilty plea should have been permitted, in part because "the inherent ambiguity in appellant's responses at the time the guilty plea was entered implies the possibility of some confusion").

tions were non-sequiturs.[29] In short, appellant contends, the portions of the plea colloquy that he highlights belie the trial judge's findings that "defendant understands his rights and ... understands the proceedings and is competent to proceed."

In reviewing a guilty plea, however, we must "examine[ ] the entire plea record and analyze[ ] the totality of the circumstances surrounding the plea." *Edwards*, 766 A.2d at 987. Here, the entire plea record and the surrounding circumstances leave no room for doubt that "the trial court engaged in a careful, probing, patient, and extensive colloquy" with appellant.[30] *Id.* at 988. The issue is whether the court "ensure[d] that [appellant] clear-

29. Appellant also quotes the following portion of the January 15, 2004 transcript as evidence of his "utter lack of understanding" of the plea proceedings:
THE COURT: Do you want to have the [DNA] testing done or give up your right to have the testing done?
DEFENDANT: Yes, I want the testing done.
THE COURT: You want the testing done. What do you want to have tested?
DEFENDANT: Well, not just the compact discs. Is that, is all I see here.
The foregoing exchange is further evidence of appellant's having gone back and forth about whether to plead guilty or instead to put the government to its proof, but, taken in context, the exchange is not as incoherent as it may appear to be in isolation. The reference to "compact discs" appears to be a reference to the compact discs that were found in McCants' car, from which latent fingerprints were lifted. Thus, they were among the physical evidence in the case that was available for DNA testing.

30. The judge noted at the outset that she was "going to be asking [appellant] a lot of questions ...." and that everyone should sit "because this might take a while." At the beginning of the proceedings, she also invited appellant to "talk to your lawyers at any time, and she repeatedly insisted that appellant talk to his attorneys when she sensed that he might be confused. Before the Rule 11 colloquy and twice during the *Frendak* inquiry, the judge reminded appellant he could speak with his lawyers, and she called breaks so that appellant could do so. Several times, the trial judge stated that she would not rush the Rule 11 proceeding, explaining at one point that she was 'willing to take as much time as we need....'"
Further, the trial judge asked appellant whether he understood the charges against him, and required him to explain the charges to her when he said that he did. She verified that he was familiar with the insanity defense and asked him to explain that to her as well. She also verified that appellant had talked with his doctors about his insanity defense possibilities.
After appellant told the court that he wanted both to plead guilty and to proceed to trial where he would use the insanity defense, the trial judge recessed so that appellant could speak with his attorneys. Although appellant derides the recess as a "court-ordered break for a coaching session," we see no basis for that characterization. Immediately before the break, when appellant expressed his desire to go to trial, the judge ended her comments by asking defense counsel "[d]o you want a couple of minutes to talk to [appellant] and just make sure that I've gotten everything right?" The judge made clear that she had no pre-disposed view as to what should be the outcome of the hearing. She said that she was willing to take the time "to resolve it in either direction," telling the defense team that "whatever way you want to go, we'll go." In addition, before the proceedings began, the judge warned the government's attorney that he may want to escort a possible witness into the hallway because "we don't know if this plea will go down."
Finally, the judge paid careful attention to appellant's expressions and demeanor, noting that "when [appellant] has a tough question, he does that little chew thing and he did that at the last question. So I may have confused him." Referring to this passage, the judge stated in her order denying the motion to withdraw the guilty plea that she "knew [appellant] so well that [she] was able to understand his facial expressions and determine whether or not [he] understood the proceedings. She further asserted that she 'carefully assessed [appellant] at each question'" and "was alert to [appellant's] responsiveness." It is precisely because the trial court is able to do this that we give great deference to a trial judge's observations and conversations with a

ly understood what rights he was giving up by entering the plea." *Id.* Several aspects of the plea record and several circumstances persuade us that the trial judge did not clearly err in finding that appellant did have the requisite understanding. First, during most of the plea proceeding, which covers fully thirty pages, appellant provided answers that responded logically to the court's questions. *Cf. State v. Shopteese,* 283 Kan. 331, 153 P.3d 1208, 1215 (2007) (holding that plea was knowing and intelligent where "[t]he transcript of [the] plea hearing contains 45 pages [and o]n 30 of those 45 pages, the district judge directly addressed [the defendant], making painstaking inquiry, to which [the defendant] made appropriate responses"). Appellant also asked the court a question about the timing of sentencing that showed an apparent understanding of the significance of the plea proceeding.

More than once appellant took exception to the court's summary or characterization of his statements, showing that he was mentally engaged in the proceedings. (*e.g.,* "Court: Are you telling me you used more force than you had to use by using the knife. Defendant: ... [N]o, I'm not saying that" and "Court: So you're saying the evidence has convinced you that it's in your best interest to plead guilty? Defendant: I don't—don't say it that way.") Further, the court did not permit appellant merely to assent to the government's proffered account of the crime, but required him to provide his own factual account. Appellant did so, thereby "demonstrat[ing] that he was actively and mentally engaged in the plea process and understood the nature of the charges he was facing" when he "disput[ed] a specific portion of the factual proffer...." *Edwards,* 766 A.2d at 988.

In addition, appellant was able to provide detailed answers about matters not related to the crime. For example, there was the following exchange:

THE COURT: Now, Mr. Wallace, are you taking any medication at this time?

DEFENDANT: At this time I am receiving units of regular insulin along with 22 units of MPH insulin at the DC Jail.

THE COURT: Okay. Are you taking any other medication, perhaps, for you mental health?

DEFENDANT: Along with 100 milligram seizure medications called Dilanta.

Finally, in considering the equivocal and illogical statements that appellant made during the plea proceeding, we are constrained to bear in mind the testimony given by the mental health experts whose opinions the trial judge credited, to the effect that appellant was "capable of dissimulating, fabricating, prevaricating and malingering cognitive disabilities." We are mindful that, unlike this court, the trial court was in a position to assess whether appellant feigned confusion or indecision during the Rule 11 hearing and deliberately gave evasive answers, or instead was actually confused. *Cf. People v. Marks,* 31 Cal.4th 197, 2 Cal.Rptr.3d 252, 72 P.3d 1222, 1237 (2003) (deferring to the trial court because "[a]n appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper," and reasoning that "once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry" (internal citations and quotations omitted)). The trial

defendant during a plea hearing. *See Edwards,* 766 A.2d at 988.

court was in a position to assess whether appellant knowingly entered his plea to second-degree murder, actually understanding and acknowledging that he "didn't have to use" a knife.

The trial judge, who noted that she "took special care to ensure that [appellant] fully understood the proceeding" and "knew [appellant] so well that [she] was able to understand his facial expressions and determine whether or not [appellant] understood the proceedings," found that appellant "has been very responsive to my questions, and I think he is fully with us." We have previously held that when denial of a motion to withdraw a plea is "based primarily on [the judge's] own personal observations of and conversations with [a defendant], ... we accord great deference." *Edwards*, 766 A.2d at 988. Such deference is warranted here.

### III.

 Lastly, appellant argues that his sentence violated due process as it was based on the prosecutor's recitation (in the government's sentencing memorandum and in argument before the court) of unsworn evidence, unverified statements by biased witnesses, and incidents of assault which appellant denied but had no opportunity to rebut.[31] We are unpersuaded by this argument. A judge has wide latitude when conducting a sentencing hearing, *Williams v. United States*, 427 A.2d 901, 904 (D.C.1980), and may rely on evidence not admissible during trial. *Caldwell v. United States*, 595 A.2d 961, 966–67 (D.C.

1991). However, due process dictates that a "trial judge may not rely on mistaken information or baseless assumptions" and must instead rely only on "*reliable* evidence." *Harris v. United States*, 612 A.2d 198, 208 (D.C.1992) (emphasis in original) (internal quotations and citations omitted). Nevertheless, when challenging the information recited during sentencing, appellant must prove that the sentencing judge actually relied on the unreliable evidence. *See Caldwell*, 595 A.2d at 967 ("[T]he judge heard appellant's explanation of [the disputed facts alleged during sentencing] and did not purport to rely on them."). A defendant claiming that his sentence was based on improperly considered evidence is not entitled to have his sentence set aside unless it is shown "(1) that the challenged evidence is materially false or unreliable, and (2) that it actually served as the basis for the sentence." *United States v. Reme*, 738 F.2d 1156, 1167 (11th Cir.1984); *see also United States v. Silverman*, 976 F.2d 1502, 1512 (6th Cir.1992) (en banc) (quoting *United States v. Robinson*, 898 F.2d 1111, 1115–16 (6th Cir.1990)); *United States v. Blade*, 811 F.2d 461, 469 (8th Cir.1987); *Jones v. United States*, 783 F.2d 1477, 1480 (9th Cir.1986); and *Moore v. United States*, 571 F.2d 179, 183–84 n. 7 (3d Cir.1978).

Assuming, *arguendo*, that the government's statements in question were "materially false or unreliable," appellant has failed to prove that this information did "actually serve[ ] as the basis for the sentence." Appellant points to the trial

---

**31.** Specifically, appellant takes issue with the government's statements that appellant was a "serial car-jacker" and had a history of knife violence against innocent civilians, the prosecutor's references to appellant having chased his girlfriend with a knife, and the prosecutor's allegation that appellant kept a "duffel bag of license plates that he collected." The first three items were based on statements by

appellant's former girlfriend that were unsubstantiated by other witnesses. The last allegation, concerning the license plates, was made in the context of the prosecutor's assertion that one of those license plates ended up on the decedent's stolen car. Appellant asserts that the license plate in question was stolen while he was institutionalized, negating any theory that he stole it.

judge's comments that appellant poses an "extreme danger ... to the community," that "[t]he sense that I have of [appellant] is that he is a very violent man," and that she "agree[s] with a good portion of the government's allocution...." These comments do not prove that the court relied on the government statements with which appellant takes issue.

There was a substantial amount of uncontested information and uncontested evidence presented during the sentencing hearing and during prior proceedings on which the trial court could draw for the view that appellant "is a very violent man" and an "extreme danger ... to the community." The government recites several examples: Appellant had to be brought to court in shackles because he had scuffled with the United States Marshals. He assaulted four workers in a halfway home. There were pictures taken of appellant's girlfriend after she had been beaten by appellant. Appellant's sister had obtained a stay away order because of his attacks on her.

In addition, several doctors gave testimony during the competency hearing that indicated that appellant was dangerous. Dr. Pickar testified that his staff at St. Elizabeths "felt [appellant] was dangerous" and that his "violence wasn't ... predictable." He went on to say that he himself "think[s] that [appellant] is exceedingly dangerous." Dr. Patterson reported that appellant was a "predator" who would assault smaller men and women during his stays at St. Elizabeths. Dr. Lally noted similar behavior, saying that appellant was violent, hostile, threatened those around

him, and "preyed on people." For sentencing, Dr. Lally submitted an affidavit stating that appellant's "violence appears to be increasing in its severity and frequence" and that this "indicate[s a] greater risk of future violence."

Further, the crime to which appellant pleaded guilty was a violent crime. As the government presents the case, appellant came up behind the decedent, stabbed him in the neck with a knife, and stole his car. Appellant's explanation at the plea proceedings was that the decedent punched him and that he responded with excessive force. Either way, appellant's act was violent. Lastly, appellant's own counsel noted that appellant had violent tendencies. His sentencing memorandum to the court indicated that appellant's behavior was "aggressive and violent." With all of this information and evidence which the court could properly consider, we cannot hold that the court's explanation at sentencing that appellant is a "very violent man" or an "extreme danger ... to the community" reflected an abuse of discretion or denied appellant due process.[32]

### Conclusion

For the foregoing reasons, appellant's conviction and sentence and the trial court's denial of appellant's motion to withdraw his guilty plea are

*Affirmed.*

---

**32.** Furthermore, appellant argued during the sentencing hearing that he disagreed with the four statements of which he now complains again. The fact that the sentencing judge heard appellant on these disputed allegations and did not purport to rely on them during sentencing gives us further assurance that the

judge did not abuse her discretion during sentencing. *See Caldwell,* 595 A.2d at 967 (finding no abuse of discretion when an appellant denied some uncharged conduct and the judge did not "purport to rely" on that conduct during sentencing).