Scott T. GREENE, Appellant,

v.

UNITED STATES, Appellee.

No. 88–69.

District of Columbia Court of Appeals.

Argued Jan. 25, 1990.
Decided March 12, 1990.

Gretchen Franklin, with whom James Klein, and Henderson Hill, Public Defender Service, Washington, D.C., were on the briefs, for appellant.

Kirby D. Behre, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Helen M. Bollwerk, Washington, D.C., and Charles W. Cobb, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and STEADMAN, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of malicious destruction of property, D.C.Code § 22–403 (1989), unlawful entry, *id.* § 22–3102 (1989), and three counts of sodomy, *id.* § 22–3502 (1989). It acquitted appellant of first-degree burglary, *id.* § 22–1801(a) (1989), and rape, *id.* § 22–2801 (1989). The trial court imposed concurrent prison sentences of three to ten years for each count of sodomy.[1] Appellant argues that, in ac-

---

1. Appellant does not challenge his convictions and imprisonment for unlawful entry (180 days) and for destruction of property (30 days), with sentences to run consecutively to each other and to those for sodomy.

quitting of rape but convicting of sodomy, the jury necessarily found the entire incident was consensual (force not being an element of sodomy). Thus, he says, prison sentences of three to ten years—presumably premised on nonconsensual sodomy—reflect a violation of due process, subject him to double jeopardy, and constitute cruel and unusual punishment. Finding appellant's arguments unpersuasive on this record, and recognizing the trial court's broad discretion in sentencing, we affirm the sodomy convictions.

## I.

The events at issue occurred during the early morning hours of November 8, 1986, in a house in Northwest Washington where the complainant lived by herself. According to the complainant's testimony, at approximately 2:00 a.m. she awakened to the sound of heavy footsteps coming across the wooden floor in the room adjacent to the bedroom where she had been sleeping. Appellant, who was carrying two garden tools, entered the room and lunged at her on the bed. He grabbed her head with one hand and made stabbing gestures with the tools in his other hand. Appellant then "backed off a bit" and mumbled comments about his having intended to break into the house next door. He also was "sexually forward" and "fondled" the complainant.

At the suggestion of the complainant, who was scared and nervous, they went downstairs. The complainant testified that she had "just wanted to try to sort of keep him talking and keep busy and keep away from him." A couple of times appellant took her wrists in his hand and held them so tightly that she could not move her arms or break his grip. He also pressed his body against hers. They remained downstairs, in the living room and in the kitchen, for almost two hours; appellant drank a beer, smoked marijuana, and talked to the complainant.

Because the complainant's back, front, and side doors were locked and required keys to unlock them from the inside, and because she kept the keys at a safe distance from the doors (so that a burglar could not get to the keys by breaking a window pane of the door and reaching in), she could not escape from danger by making a quick exit.[2]

At approximately 4:00 a.m., while still downstairs on the living room couch, appellant tried to unbutton the complainant's pajama top. She resisted. Appellant said he wanted to go back upstairs and would carry her over his shoulder if she refused to walk. The complainant testified, "It was very clear that he wanted to have sex. And ... he said he wasn't going to leave until he got what he came there for." They walked upstairs and into one of the bedrooms. The complainant sat on the bed while appellant emptied his pockets onto the dresser and took off his pants. Appellant then moved the complainant's head to his penis, making her perform "an act of oral sex." After that, appellant undressed her, spread her legs, and "performed an act of oral sex" on her. He then lay down on top of her and "had vaginal intercourse."

Afterwards, appellant said he was thirsty but would neither go downstairs by himself to get another beer nor let the complainant get one by herself. During the entire ordeal, appellant had not let the complainant out of his sight. They went downstairs together, got a beer, and returned to the bedroom. Appellant wanted to continue having sex and performed "another act of oral sex" on the complainant. He also wanted to have intercourse, but she said she was too tired and feigned sleep. Appellant locked his arms around her and fell asleep. When appellant's arms loosened and the complainant was sure he was asleep, she slipped from the bed and out of the room.

The complainant went downstairs and immediately unlocked the back door. She telephoned a neighbor to make sure he would let her in and ran across the street to his house. They called the police, who arrived shortly thereafter. The police went into the complainant's house, found appellant sleeping, woke him, and arrested him.

---

**2.** Appellant had entered the house through a basement window, which he had broken.

Appellant offered the jury quite a different version of what happened that evening. He testified that he had had quite a bit to drink and that a friend had left him near the complainant's neighborhood with no way to get home. Shortly after midnight, he walked to the home of another friend, who happened to live next door to the complainant in a house that looked "pretty much" the same as hers. He knocked for some time on the friend's front door. When his friend finally answered, he told appellant he could spend the night there on the couch. Appellant did not stay, however. Instead he went to a nearby bar and drank until closing time.

Appellant further testified that when he returned to the friend's home, he went around back to rap on the basement window. Appellant believed that the friend and his wife were sleeping in the basement because the house, in which there had been a recent fire, was being remodeled. Appellant accidentally broke the window and climbed inside, all the while calling out to his friends. He went up the basement stairs, through the main level of the house, up to the second floor, and happened onto the complainant, sleeping. He shook her awake and asked for his friends. According to appellant, both he and the complainant were startled and scared. At that point, appellant testified, "I realized that ... I was in the wrong house...." He apologized and told the complainant he was looking for his friends. She got out of bed and put on a housecoat; they went downstairs. She offered to fix coffee, but he requested a beer, which she provided, and they sat in the living room talking for about an hour and a half. Appellant told the complainant that he had worked with another friend, John Kerins, when complainant had hired Kerins to roof her garage. (Although appellant had not met the complainant when he did the work, he had seen her from a distance when she paid Kerins.)

Appellant also testified that he did not have gardening tools with him, he did not try to press his body against the complainant, and she led him back upstairs to a bedroom. After they got into bed, appellant testified, "I thanked her for being so—for being so nice, and I told her I was very sorry about everything, and I embraced her, I kissed her. And basically that was it. I fell asleep. I fell asleep in her arms." According to appellant, they did not have intercourse or engage in any act of sodomy. He slept until the police awakened him. Throughout the night, appellant said, while he was in the complainant's home, she never asked him to leave.

## II.

The jury convicted appellant of three counts of sodomy but acquitted him of rape. Appellant argues that the trial court's concurrent three-to-ten year prison sentences violate due process and the constitutional prohibitions against double jeopardy and cruel and unusual punishment, given that the verdict necessarily implies consensual, not forceful, sodomy.

In general, the sentencing court may consider all the evidence presented at trial, including evidence of charges on which appellant was acquitted. *See Williams v. New York,* 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949) (sentencing judge exercises "wide discretion in the sources and types of evidence used to assist him [or her] in determining the kind and extent of punishment to be imposed within limits fixed by law"), *quoted in Butler v. United States,* 379 A.2d 948, 950 (D.C.1977); *Sobin v. District of Columbia,* 494 A.2d 1272, 1275 (D.C.) (trial court "must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed"), *cert. denied,* 474 U.S. 860, 106 S.Ct. 173, 88 L.Ed.2d 144 (1985); *see also Sloan v. United States,* 527 A.2d 1277, 1291 (D.C.1987) (Ferren, J., concurring in part and dissenting in part) (sentencing judge not precluded from considering evidence related to charge on which jury acquitted); *United States v. Bernard,* 757 F.2d 1439, 1444 (4th Cir.1985) (same); *United States v. Sweig,* 454 F.2d 181, 184 (2d Cir.1972) (same). The sentencing judge, however, may not base

the sentence on " 'misinformation of a constitutional magnitude.' " *Bernard*, 757 F.2d at 1444 (quoting *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)). *See also United States v. Campbell*, 221 U.S.App.D.C. 367, 379, 684 F.2d 141, 153 (1982).

Despite such broad sentencing discretion, the trial court, in determining the appropriate sentence, attempted to view the evidence from the jury's perspective, giving effect to the entire jury verdict by considering the impact, if any, of the acquittal of rape on the convictions of sodomy. In particular, the court evaluated whether the acquittal of rape necessarily implied that the sodomy was consensual.[3] If it did, then presumably the sentence should be considerably lighter than for nonconsensual sodomy.

■ Appellant's argument that the jury necessarily found consent to sodomy begins with the jury instructions on rape. In order to convict for rape, the jury would have had to find (1) the defendant had sexual intercourse with the complaining witness, and (2) the act was committed forcibly and against her will. *See* D.C. Code § 22–2801 (1989); Criminal Jury Instructions for the District of Columbia, No. 4.74 (3d ed.1978). Acquittal indicates the jury was unable to find both elements beyond a reasonable doubt. On the premise that there was conclusive evidence of intercourse and, further, that on this record the entire incident comprising the alleged rape and sodomy must be viewed as either consensual or nonconsensual, appellant argued at sentencing, and again on appeal, that the acquittal of rape necessarily meant the jury found that appellant did not employ force or threats sufficient for a finding of nonconsensual acts. Because the jury therefore acquitted of rape, it was able to convict of sodomy only because it was instructed that consent is not a defense, not because there was room to find nonconsensual sodomy.

■ For two reasons, the trial court rejected this argument. First, the court believed the acquittal may have indicated the jury was unable to find the considerable level of force necessary to satisfy, beyond a reasonable doubt, the second element of the crime.[4] The trial court recognized that the jury's failure to find the level of force necessary to convict of rape would not necessarily mean the jury believed that there was no force at all—that the event was altogether consensual. See *supra* note 3.

Second, the court noted the acquittal may have been the jury's response to inconclusive evidence of penetration concerning the first element of the crime. Any labial penetration, however slight, constitutes sexual intercourse. *Williams v. United States*, 357 A.2d 865, 867 (D.C.1976).

---

**3.** At the sentencing hearing, the judge said:

I can't substitute what I would have done with the evidence for what the jury did and I can't sentenc[e] him for rape. But that doesn't mean I have to blind myself to the evidence that was presented in its totality in the case in looking at whether or not it would be irrational and bizarre for a jury to find non-consensual sodomy, having acquitted of rape, and I don't think it would be at all.

**4.** Consistent with the law in this jurisdiction, the trial court had instructed the jury on the second element as follows:

To establish the second element it's necessary that the sexual intercourse have been [committed] forcibly, against the will of the complainant. This means that the government must prove beyond a reasonable doubt that the complainant did not consent to the sexual intercourse.

Consent may be contained in the words or in the actions of the complaining witness. If the complaining witness submitted to sexual intercourse but her submission was induced by physical force or by threats which put her in reasonable fear of death or serious bodily harm, or by a combination of physical force and threats which put her in reasonable fear of death or serious bodily harm, her submission under such circumstances would not be consent.

You may not find that the complaining witness submitted out of fear [of] serious bodily harm unless her fear is shown to have been based on something of substance as would convey a fear of death or serious bodily harm to the ordinary person. In other words, her fear must have been reasonable in light of the circumstances at the time of the alleged offense and the conduct of the defendant as shown by the evidence.

*See* Criminal Jury Instructions for the District of Columbia, No. 4.74 (3d ed.1978).

While the complainant testified unequivocally that penetration had occurred, the medical testimony of the emergency room physician who examined the complainant after the incident was not conclusive on that question. The physician testified that his findings were compatible with recent intercourse; but he acknowledged that, when he had completed a police form asking if his findings were compatible with vaginal penetration, he had answered no. As the trial court saw the situation, the jury may have had a reasonable doubt as to the first element of the crime, and thus acquitted, while still believing the sexual acts were nonconsensual.

■■■ We agree with the trial court's analysis. The jury's acquittal of rape was not inconsistent with a perception of non-consensual sodomy on this particular record. In accordance with such a perception, the trial court sentenced appellant to prison for three to ten years on each count. These sentences were within the statutory ten-year maximum, *see* D.C.Code § 22–3502, and are thus unreviewable aside from constitutional considerations. *See In re L.J.*, 546 A.2d 429, 434–35 (D.C.1988) (severity of sentences within statutory limits unreviewable on appeal); *Bernard*, 757 F.2d at 1444 (sentence within statutory maximum unreviewable unless based on constitutional error).

Appellant's constitutional arguments (due process, double jeopardy, and cruel and unusual punishment) are based entirely on the premise—which we have rejected—that the jury must have convicted on three counts of *consensual* sodomy. Because the jury did not necessarily find the sodomy was consensual, the judge is not precluded, on grounds of double jeopardy or due process, from considering evidence of force at sentencing. *Cf. Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (double jeopardy protections apply where jury by its verdict necessarily found appellant had not been one of the robbers). Nor could appellant's sentences be cruel and unusual punishment, in violation of the eighth amendment, given the trial court's reasonable perception, lawfully applied,

that the three instances of sodomy were nonconsensual.

*Affirmed.*