Robert A. WHITE, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–942.

District of Columbia Court of Appeals.

Argued Sept. 17, 2008.
Decided Oct. 16, 2008.

Mindy A. Daniels, appointed by this court, for appellant.

Perham Gorji, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, Roy W. McLeese III, Thomas J. Tourish, Jr., and Deborah L. Connor, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

A jury convicted appellant Robert White of first-degree sexual abuse of a ward. *See* D.C.Code § 22–3013 (2001). White challenges both his conviction and his sentence, arguing that the evidence was insufficient to support a finding of guilt and that his sentence is unlawful. We affirm.

## I.

The government's evidence at trial was as follows. Complainant Timothy Jones[1] testified that on November 19, 2004, she had been an inmate in Unit E–2–B at the District of Columbia Correctional Treatment Facility (CTF) for about a week. That morning, when returning from a visit to the law library, Jones requested appellant, who was a correctional officer at the CTF, to help her unlock her cell. Jones had never met White before that day, but she had spoken with him several times that morning, including when she was visiting Darnell Yates, another transgender inmate,[2] and during the mid-morning count of prisoners. In response to the request, White asked Jones to step back into the shower area inside the bathroom next to Jones's cell. Jones complied, thinking that White was going to search her cell. Shortly thereafter, White approached Jones with his pants unzipped and his genitals exposed. White masturbated while look-

---

1. Jones testified that she "became a transgender" at age fourteen and has used the name "Pam" or "Pamela Jones" ever since. At trial, Jones requested to be called "Ms. Jones," and the court referred to Jones as a female and instructed the attorneys to do so as well. We adopt the same convention. We note that this approach is consistent with the spirit of regulations implementing the D.C. Human Rights Act, which (though applicable only to employers and others specified in the Act) provides that "[d]eliberately misusing an individual's preferred ... gender-related pronoun" may "constitute evidence of unlawful harassment and hostile environment." 4 DCMR § 808.2(a) (2006).

2. Jones and Yates addressed called each other as "Pam" (Jones) and "Tanya" (Yates).

ing at Jones, and he told Jones to step further back into the shower area. White then ordered Jones to bend down and open her mouth. Jones complied, and White "placed his hand on [Jones's] shoulder" and gave her a "slight tug" to coax her down. White then "stuck his penis in [Jones's] mouth . . . [and] ejaculated in [Jones's] mouth."[3] After ejaculating, White "pulled out" of Jones's mouth.

Jones returned to her cell and spit the semen from her mouth into a Styrofoam cup. Moments later, Correctional Officer Tocarra Rogers approached Jones's cell while conducting a "cross count," and Jones told Rogers that she needed to speak with her. When Rogers entered the cell, Jones told her that White had "sexually assaulted" her and showed her the cup containing semen. Jones also asked for permission to use the telephone and, when she received it, she called her mother and told her of the assault. A CTF official later escorted Jones off her unit and had her meet with Metropolitan Police Department ("MPD") investigators.

Correctional Officer Rogers testified that, when she was doing a cross-count of CTF Unit E–2–B on November 19, 2004, Jones asked to speak with her. Appearing "frantic" and "upset," Jones told Rogers that White had made her "have oral sex." Jones showed Rogers a white substance on her hand and in a cup. Although Jones asked her to keep the matter private, Rogers told her supervisor what Jones had reported. CTF Nurse Veraellyn Short testified that, on the day in question, Jones, who appeared "afraid" and "very anxious," had reported the incident to her. MPD Detective Lisa Adams–Williams also testified about Jones's report to her about the incident. Jones told Adams–Williams that she had observed that White was uncircumcised and wearing blue and white boxer shorts. Adams–Williams confirmed these observations during her own examination of White's underwear and genitalia.

Government experts testified that swabs from Jones's hand and the Styrofoam cup tested positive for semen. Of two swabs from Jones's mouth, only one tested positive for semen. DNA analyses revealed that the sperm cells present in the swabs of Jones's hand and the Styrofoam cup came from White. DNA analyses of Jones's mouth swabs (swabs Q3 and Q4), however, identified Jones as the only source of sperm and non-sperm cells and excluded White as a contributor.

Appellant White was the sole witness for the defense. He testified that, when investigating a loud noise that came from the bathroom beside Jones's cell, he discovered Jones in the bathroom shower stall with two books. He escorted Jones to her cell, and, puzzled as to why Jones had been in the shower, returned to the bathroom to inspect the area and make sure that Jones had not been hiding contraband. He discovered a pornographic picture affixed to the interior of one of the bathroom stalls. Aroused, White entered that stall and began masturbating. Just as he was in the process of ejaculating, he noticed that Jones had come back into the bathroom and was looking at White's exposed penis. Upon noticing Jones, White snatched the pornographic picture, crumpled it up, and flushed it down the toilet. He hoped that his semen had gone down the toilet but did not check to see whether it had. White let Jones use a different stall and left the bathroom. White denied having sexual contact of any nature with Jones.

On March 15, 2006, the jury convicted White as charged of first degree sexual

---

3. Jones denied, however, that White made her perform "oral sex" upon him.

abuse of a ward. *See* D.C.Code § 22–3013 (2001). On July 21, 2006, the trial judge (the Honorable Erik Christian) sentenced White to eighty-four months' imprisonment. Referencing section 5.2.2 of the District of Columbia Voluntary Sentencing Guidelines (the "Voluntary Sentencing Guidelines" or the "Guidelines"), Judge Christian stated that he was departing from the recommended sentence of one to three years' imprisonment in light of his finding that White knew or should have known of Jones's transgender status, which, the court reasoned, constituted a "reduced physical capacity." White timely appealed.

## II.

■ We first consider White's challenge to the sufficiency of the evidence to support his conviction. We "review[ ] the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Scott v. United States*, No. 04–CF–527, 2008 WL 3861363, at *8 (D.C. Aug. 21, 2008) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987)). "[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Florence v. United States*, 906 A.2d 889, 893 (D.C.2006) (internal quotations and citations omitted). In this case, therefore, we must affirm the conviction if there was evidence from which reasonable jurors could fairly infer that White committed a "sexual act" against Jones, specifically, as charged, "contact between [Jones's] mouth and [White's] penis." D.C.Code § 22–3001(8)(B) (2001).

■ In arguing that the evidence was not sufficient to establish that a sexual act occurred, White first emphasizes that

there were "no eyewitnesses" to the incident and that "Jones did not refer to actual contact between his mouth and White's penis." White acknowledges that a conviction may rest upon the credible testimony of one witness alone, but maintains that Jones's testimony was not credible because it was undermined by the witnesses' differing accounts of what Jones reported and by the DNA evidence (which, he contends, is "not inconsistent with the defense theory that Jones came upon White in the bathroom, caught him masturbating, and collected White's sperm for his own story").

■ White is correct that there were differences in the testimony of the government's witnesses about the incident reported by Jones. According to Rogers, Jones reported that White made Jones have "oral sex." Nurse Short testified that Jones said White made Jones "suck his thing." Detective Adams–Williams testified that Jones reported that White "forced [Jones] to suck his penis until he ejaculated." By contrast, in her testimony, Jones denied engaging in "oral sex," testifying instead that Rogers put his penis in her mouth and ejaculated. But, as we stated in *Payne v. United States*, 516 A.2d 484 (D.C.1986), "contradictions between witnesses at trial are inevitable . . . ," *id.* at 495, and the jury, whose job it is to "resolve [contradictions] as they weigh all the evidence," *id.*, could have reasonably found that any variation in the testimony was purely semantic or otherwise immaterial. Moreover, testimony is not inherently unbelievable simply "because it was inconsistent with the testimony of other government witnesses, [or] was at times, internally inconsistent." *Id.*

White further contends that, even taking Jones's testimony as true, the jury had no basis for finding that there was the "actual physical contact" required for conviction.

White acknowledges that Jones testified to contact between Jones's mouth and White's semen. However, emphasizing Jones's denial of any "oral sex" between herself and White, White argues that Jones's testimony did not establish that there was contact between Jones's mouth and White's penis, as was required to convict White of the "sexual act" described in D.C.Code § 22–3001(8)(B). We reject this argument. Even if "mere" contact between Jones's mouth and White's semen falls outside the statutory definition of "sexual act"—a proposition that we would be loathe to accept—Jones's testimony did describe contact between her mouth and appellant's penis. Jones's statement "he came in my mouth" could denote that White's penis, not just his semen, entered Jones's mouth. To the extent that this testimony was ambiguous as to the meaning of "came," the jury had the prerogative to resolve this ambiguity in favor of a finding of guilt. *See Clark v. United States,* 755 A.2d 1026, 1031 (D.C.2000) (deferring to the jury's finding that an ambiguous phrase constituted a threat under the circumstances).

■ Further, Jones testified unambiguously that White "stuck his penis in [her] mouth" and subsequently "pulled out." The "mouth" includes the cavity behind the lips containing the tongue, teeth, and gums.[4] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1479 (3d. ed. 2002) (defining "mouth" as *"the opening* through

which food passes into the body of an animal," *"the orifice* in the head of higher vertebrates bounded by the lips or jaws," *"the cavity* bounded externally by the lips or jaws and internally by the pharynx or gullet that encloses in the typical vertebrate the tongue, gums, and teeth," and "the structures enclosing or lying within the *mouth cavity regarded as a whole")* (emphasis added). Thus, we conclude, an object comes into contact with the mouth if it enters this cavity, regardless of whether the object also touches the tongue or lips as it would during the act of "sucking." And, as already described, there was testimony from which the jury could find that there was contact between White's penis and Jones's mouth cavity.[5]

■ Finally, we do not agree that the DNA testimony rendered Jones's testimony incredible. Although "[t]he determination of credibility is for the finder of fact, and is entitled to substantial deference," *Bouknight v. United States,* 867 A.2d 245, 251 (D.C.2005), "[t]he one exception to this general rule is if the testimony of a witness is inherently incredible under the circumstances." *Robinson v. United States,* 928 A.2d 717, 727 (D.C.2007). White's argument reflects this court's rulings that "the doctrine of inherent incredibility can be invoked ... when the testimony can be disproved ... by scientific evidence...." *Id.* at 727–28 (internal quotations and citation omitted). But the evidence here does

---

4. We see no reason to depart from the ordinary meaning of the word "mouth" in construing the statute at hand. *See, e.g. Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc) ("[I]t is axiomatic that the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them.") (internal quotations and citations omitted).

5. White relies on *Proctor v. United States,* 685 A.2d 735 (D.C.1996), but we are at a loss to understand how that decision helps his case. Our holding in *Proctor* was that because the government had to prove that the defendant placed his penis *into* the complainant's mouth to prove that the defendant committed sodomy as charged under D.C.Code § 22–3502 (1981), and because the complainant testified only that she put her mouth *on* defendant's penis, the evidence was insufficient to sustain the conviction for sodomy. *Id.* at 737–38.

not support application of the doctrine of inherent incredibility. The evidence that is the focus of White's argument is the testimony by DNA analyst Hickey that the DNA taken from the Q4 swab of Jones's mouth contained both a sperm and non-sperm fraction, that the sperm fraction matched Jones's DNA, and that White was excluded as a source of either fraction. This scientific evidence, White contends, is entirely inconsistent with Jones's claim that White ejaculated into her mouth and renders incredible her claim that White put his penis in Jones's mouth. White's argument ignores, however, analyst Hickey's additional testimony that the technique he used to separate the sperm and non-sperm fraction of the sample is "not a perfect technique," that "[t]here can be crossover" between sperm and non-sperm fractions and that "if there were very few sperm, you might see someone else's DNA [in the sperm fraction in addition to the donor's DNA] and, in fact, you could have situations where there are so few sperm that you would only see the other person's DNA." In light of Jones's testimony that she "spit the semen in a cup" the scientific evidence permitted the jury to infer that there were few sperm in Jones's mouth (an inference supported by testimony that the Q3 mouth swab was negative for sperm) and that the crossover effect that Hickey described was the explanation for why Jones's, but not White's, DNA was found in the sperm from the mouth swabs. And, as the government emphasizes, the emission of semen is not required for there to be the "sexual act" referred to in D.C.Code § 22–3013. *See* D.C.Code § 22–3001(8)(D) ("The emission of semen is not required [for there to be a 'sexual act' within the meaning of the statute]").

## III.

White assails the validity of his eighty-four month prison sentence on multiple grounds. First, he complains of the trial judge's departure from the Voluntary Sentencing Guidelines, which recommend a one-to three-year prison term for first-time offenders (such as appellant) convicted of first degree sexual abuse of a ward.[6] More specifically, White complains that Judge Christian erred in treating Jones's transgender status as one that rendered her "particularly vulnerable due to age or reduced physical or mental capacity" and made Section 5.2.2(2) of the Guidelines applicable.

▮ We decline to interpret Section 5.2.2(2) and therefore decline to consider whether transgender status signifies "reduced physical capacity," as the trial judge reasoned. By design, the Voluntary Sentencing Guidelines are entirely voluntary, and judges are free to apply or ignore them as they see fit without interference by this Court. *See* D.C. SENTENCING GUIDELINES MANUAL at § 5.3 ("The guidelines are voluntary.... [A]ny lawful sentence is not appealable whether or not it complies with the guidelines."); *see also* D.C.Code § 3–105(a)–(c) (2001) ("The voluntary sentencing guidelines ... shall not be binding on judges [and] shall not create any legally enforceable rights in any party"); *Cook v. United States*, 932 A.2d 506, 507 (D.C.2007) ("the Superior Court Voluntary Sentencing Guidelines ... being *voluntary* would not have compelled the trial court to impose a lesser sentence") (emphasis in original). The Maryland Court of Special Appeals' observation about that jurisdiction's voluntary sentencing guidelines is applicable to the District's

---

**6.** *See* THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA VOLUNTARY SENTENCING GUIDELINES PRACTICE MANUAL, apps. A, C (2006).

Guidelines as well: "Whether ... a trial judge scrupulously follows, outrageously flouts or clumsily misapplies the sentencing guidelines is simply none of our appellate business, unless ... such flouting or misapplying should coincidentally trigger one or more of our more limited and traditional reasons for reviewing a sentence." *Teasley v. State*, 54 Md.App. 454, 458 A.2d 93, 94 (Ct.Spec.App.1983), *aff'd*, 298 Md. 364, 470 A.2d 337 (1984).[7]

■ Relying on *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), White next argues that "reasonableness" is the appropriate standard by which appellate courts should review trial court sentences, and he urges us to invalidate his sentence as "unreasonable." *Booker* is inapposite, however, because it rests on requirements imposed by a federal statute (18 U.S.C. § 3553(a), describing "factors to be considered in imposing a sentence") rather than on the Constitution or other authority that controls in the District of Columbia. *See Booker, supra*, 543 U.S. at 260–61, 125 S.Ct. 738 (explaining that the "unreasonableness" review standard can be inferred

from the statutory language and the structure of the statute). In this jurisdiction, we have long followed the rule that "sentences within statutory limits are unreviewable aside from constitutional considerations." *Crawford v. United States*, 628 A.2d 1002, 1003–04 (D.C.1993) (quoting *Greene v. United States*, 571 A.2d 218, 222 (D.C.1990)) (internal quotation marks omitted); *see also In re L.J.*, 546 A.2d 429, 434 (D.C.1988) ("[t]he refusal of courts to review on appeal sentences which are within statutory limits, upon the ground that such sentences are too severe, is of long standing").[8]

■ White's third argument is that the trial judge's sentencing procedure deprived him of his Sixth Amendment right to a jury trial. Citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), he contends that it was impermissible for the trial judge to enhance his sentence based on the judge's own finding that Jones is a transgendered person, and that the judge could rely on that fact only if it had been found by the jury beyond a reasonable doubt.[9] *Appren-*

---

7. White also claims that the judge's failure to notify him in advance of his intention to make an upward departure from the Guidelines-recommended sentence violated due process. However, he cites no authority in support of this claim, and analogous authority suggests just the opposite. In *Irizarry v. United States*, — U.S. ——, 128 S.Ct. 2198, 2202, 171 L.Ed.2d 28 (2008), the Supreme Court reasoned that the Due Process Clause does not require notice to the defendant before a federal judge may depart from the sentence recommended by the (now-advisory) federal Sentencing Guidelines. *See* 128 S.Ct. at 2202 ("[t]he due process concerns that motivated the Court to require notice in a world of mandatory Guidelines no longer provide a basis for this Court to [require such notice]").

8. Moreover, we note, the Supreme Court has rejected the contention that "every variance from the [federal] advisory Guidelines is un-

reasonable." *Rita v. United States*, — U.S. ——, 127 S.Ct. 2456, 2467, 168 L.Ed.2d 203 (2007).

9. White also likens his sentence to a sentence for a bias-related crime, *see* D.C.Code § 22–3703 (2001), even though the government never tried or convicted him for such an offense. However, nothing in the sentencing transcript or trial testimony suggests that the court premised the sentence on evidence of bias. And, in any event, it is unclear how White's assertion could bolster his argument that his sentence was impermissibly long. Section 22–3703 permits a sentence of up to one-and-one-half times the statutory maximum for a defendant found guilty of a bias-related crime (and thus precludes a greater sentence), while White's sentence was well below the (ten-year) statutory maximum for first-degree sexual abuse of a ward.

*di,* however, is inapposite. Under *Apprendi* and its progeny, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum,*" *id.* at 490, 120 S.Ct. 2348 (emphasis in original), *i.e.,* "the maximum [a judge] may impose *without* any additional findings," *Blakely v. Washington,* 542 U.S. 296, 303–04, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (emphasis in original), "must be submitted to a jury, and proved beyond reasonable doubt." *Apprendi,* supra, 530 U.S. at 490, 120 S.Ct. 2348. D.C.Code § 22–3013 (2001), the statute under which White was convicted, permitted the trial judge to impose a sentence of up to ten years for anyone found guilty of the offense. Because White's eighty-four month sentence does not exceed that statutory maximum, his case presents no *Apprendi*-type Sixth Amendment violation.

■■■■ We also reject White's argument that, particularly in light of the fact that he had no prior criminal history, his eighty-four month sentence amounts to cruel and unusual punishment in violation of the Eighth Amendment. A criminal sentence runs afoul of the Eighth Amendment only if it is "grossly disproportionate" to the crime. *Cook, supra,* 932 A.2d at 508 (citing *Harmelin v. Michigan,* 501 U.S. 957, 959, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). None but the most extraordinarily harsh sentence satisfies this standard. *See, e.g., Cook, supra,* 932 A.2d at 508 (affirming a twelve year sentence, which exceeded Guideline-recommended sentence but was within the statutory maximum, for possession of heroin with intent

to distribute). As the trial judge explained, White's sentence was intended to reflect his victim's particular vulnerability as a transgender inmate in an all-male prison unit and, we are satisfied, appropriately reflects what the government's evidence showed was the non-consensual nature of the encounter.[10] We cannot say that the sentence was so grossly disproportionate to the offense of which White was convicted that it offends the Eighth Amendment.

■■■■ White's final challenge to his sentence rests on our case law recognizing that, consistent with due process, a trial judge "may not rely on mistaken information or baseless assumptions and must instead rely only on *reliable* evidence." *Wallace v. United States,* 936 A.2d 757, 780 (D.C.2007) (emphasis in original) (internal quotations and citations omitted); *see also Greene, supra,* 571 A.2d at 220–21 ("[t]he sentencing judge, however, may not base the sentence on misinformation of a constitutional magnitude") (internal citations and quotations omitted). Specifically, White argues that there was no basis for Judge Christian's conclusion that White, who had not encountered Jones before November 19, 2004, knew of and took advantage of Jones's transgender status, or for the court's finding that transgender status confers particular vulnerability. However, to prevail on a challenge to the factual basis for a sentence, an appellant must show that the purported facts or evidence that the court relied on are materially false or unreliable. *See Wallace, supra,* 936 A.2d at 780; *see also*

---

**10.** White could have been convicted under the statute even if the act charged had been consensual. *See* D.C.Code § 22–3017(a) (2001) (providing that consent is not a defense). However, the non-consensual nature of White's contact with Jones warranted a longer sentence than might have been appropriate if Jones had consented to the contact. *Cf. Greene, supra,* 571 A.2d at 221–22 (assuming that a prison sentence for non-consensual sodomy should be longer than a sentence for consensual sodomy even where consent is not a defense to the crime).

*Powers v. United States*, 588 A.2d 1166 (D.C.1991) (upholding sentencing judge's reliance on, among other things, prosecutor's proffer that defendant had committed an uncharged robbery). White cannot meet this burden. Neither in his testimony at trial nor in his lengthy statement to the court at sentencing did White deny that he knew of Jones's transgender status—a glaring omission since, prior to White's statement at the sentencing hearing, the court and counsel had discussed at length whether there was evidence that White knew. Moreover, the court heard and explicitly took into account Jones's testimony that she did not scream for help during the encounter with White and was afraid to report it, fearing that because people perceived her as a "faggot" or "punk" and would "turn[ ] against" her, no one at CTF would have believed her accusations against an officer. This was testimony from which Judge Christian could reasonably have concluded that Jones's transgender status made her especially vulnerable. The court also heard Jones's testimony that she and another transgen-

der inmate were close, that they always referred to each other by feminine names, that White saw Jones and the other inmate together, and that Jones was wearing a "headwrap" when White encountered her during the mid-morning count. Judge Christian also had an opportunity to observe Jones' appearance and demeanor in court, and could have concluded that her gender identity was apparent, such that White would have become aware of it upon seeing her.[11] On this record, we have no basis for concluding that Judge Christian relied on "materially false or unreliable" evidence in determining White's sentence.

Accordingly, for the foregoing reasons, the judgment is

*Affirmed.*

---

11. Jones stated that, while at CTF, she wore a generic prison uniform, had short hair, and did not wear makeup as she did at trial. However, as case decisions reflect, a common perception is that there is more to appearing feminine than one's hairstyle or dress. *Cf. Schroer v. Billington*, 424 F.Supp.2d 203, 205 (D.D.C.2006) (describing plaintiff's "living and presenting herself as a woman," which entailed more than using a traditionally feminine name and dressing in traditionally feminine attire); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *superseded by statute on other grounds* (recounting evidence that colleagues advised Hopkins to walk and talk "more femininely").